## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| ANTERO RESOURCES CORPORATION, | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 4:16-cv-00668-Y |
| | § | |
| v. | § | |
| | § | |
| C&R DOWNHOLE DRILLING, INC., C&R | § | |
| DOWNHOLE DRILLING, LLC, BLACK | § | |
| DIAMOND HOT SHOT, LLC, STRC | § | |
| OILFIELD TECHNOLOGY, LLC, BIG TEX | § | **JURY TRIAL DEMANDED** |
| WELL SERVICES, LLC, AND TOMMY | § | |
| ROBERTSON, Individually, | § | |
| | § | |
| Defendants. | § | |

## ANTERO'S BRIEF IN OPPOSITION TO TOMMY ROBERTSON'S MOTION FOR JUDGMENT ON THE PLEADINGS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(C)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iv

INTRODUCTION ................................................................................................................1

BACKGROUND ..................................................................................................................2

    A.    Antero's Operations .......................................................................................2

    B.    This Litigation ...............................................................................................3

    C.    The Robertson defendants continued to stonewall Antero's attempts to uncover the kickbacks and benefits they provided to Antero personnel ......................3

    D.    Antero uncovers a widespread kickback scheme under which Tommy Robertson corrupted the key Antero personnel working in West Virginia.. .................4

    E.    Antero's proposed amended complaint—as well as the current operative complaint— seek both contract damages and non-contract damages arising in tort law. ...................................................................................................5

        1.    Antero's contract damages .................................................................5

        2.    Antero's tort claims seek disgorgement, restitution, and other equitable gains-based remedies, but do not seek expectation or benefit-of-the-bargain damages. ...................................................................................5

ARGUMENT.......................................................................................................................6

I.    Tommy Robertson's Rule 12(c) motion is procedurally improper. ...................................6

II.    Antero has pleaded its fraud claim with sufficient particularity. ...................................9

    A.    Tommy Robertson misstates Rule 9(b)'s standard .........................................9

    B.    Antero's fraud allegations—based on the kickback scheme that Robertson orchestrated—are sufficiently particularized and give him fair notice to "prepare a defense." ............................................................................9

III.    Neither the gist of the action doctrine, economic-loss rule, nor any other related rule bars Antero's tort claims. ...................................................................................13

    A.    Robertson's reliance on the economic loss rule fails at the threshold because there was no contract between him and Antero. .........................................14

    B.    Tommy Robertson ignores the established exceptions to the economic loss rule for intentional torts and ignores the fact that tort law, not any contract, prohibits him from defrauding Antero and corrupting its employees.........................15

1.      Robertson's individual liability does not arise from any contract with Antero, but rather tort law, thus rendering the economic loss rule inapplicable. ...........................................................................................15

2.      Robertson bases his argument on inapposite authority from a lower court in Pennsylvania that the Pennsylvania state supreme court has since repudiated.................................................................................18

C.      Antero seeks non-contract damages for its tort claims, eliminating any doubt that its tort claims are based on duties that exist "regardless of the contract."...........19

IV.     Antero has pleaded a cognizable claim that Robertson is personally liable for the defendant companies' conduct..........................................................................20

A.      Based on the kickback scheme and his suspicious dissolution of the Pennsylvania defendant company, Antero has alleged that Robertson used the corporate form to perpetrate a fraud and work an injustice. ........................................21

B.      Antero has pleaded a proper claim for alter ego, both for its tort claims and its contract claims, which require a distinct analysis under Texas. ....................................23

1.      Robertson fails to analyze the tort claims under the proper framework, which is fatal to his alter ego defense...................................................................23

2.      Alter ego as to the contract claims is plausibly pleaded based on extensive comingling between Robertson and the defendant companies, the companies' structure, and the substantial control Robertson exercised..........................................................................................24

CONCLUSION.........................................................................................................25

CERTIFICATE OF SERVICE ................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014) ................................................................. 16, 19

*Carroll v. W. Virginia Reg'l Jail & Corr. Facility Auth.*, No. 14-cv-17012, 2015 WL
    1395886 (S.D.W. Va. Mar. 25, 2015) ...................................................................................... 17

*CCE, Inc. v. PBS&J Constr. Servs.*, 461 S.W.3d 542 (Tex. App. 2011—Houston
    [1st Dist.] pet. denied) .............................................................................................................. 19

*Cypress/Spanish Ft. I, L.P. v. Prof'l Serv. Indus., Inc.*, 814 F. Supp. 2d 698 (N.D.
    Tex. 2011) ................................................................................................................... 9, 10, 11, 12

*Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006) ............................................................ 20

*Dommel Properties LLC v. Jonestown Bank & Tr. Co.*, 626 F. App'x 361 (3d Cir.
    2015) .............................................................................................................................................. 19

*EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265
    (S.D.N.Y.2004) ........................................................................................................................... 16

*EEOC v. United Parcel Serv., Inc.*, No. 15-cv-4141, 2018 WL 1402240 (E.D.N.Y.
    Mar. 5, 2018) ................................................................................................................................. 7

*eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10 (Pa. Super. Ct. 2002) .................................... 18, 19

*Felman Prod., Inc. v. Indus. Risk Insurers*, No. 09-cv-0481,
    2010 WL 3119338, (S.D. W. Va. July 28, 2010) ................................................................... 13

*Gibbs v. Primelending*, No. 10-cv-00293, 2010 WL 4056146 (E.D. Ark. Oct. 14,
    2010) .............................................................................................................................................. 11

*Hart v. Bayer Corp.*, 199 F.3d 239 (5th Cir. 2000) .......................................................................... 9

*Hebert Abstract Co., Inc. v. Touchstone Properties, Ltd.*, 914 F.2d 74 (5th Cir. 1990) ........................ 6

*Henry v. Masson*, 333 S.W.3d 825 (Tex. App.—Houston [1st Dist.] 2010, no
    pet.) ............................................................................................................................................... 20

*Impac Warehouse Lending Grp., Inc. v. Gen. Mortg. Corp. of Am.*, No. 04-cv-418, 2006 WL 1877095 (M.D. Fla. July 6, 2006) ...................................................... 14, 15

*In re E.S. Bankest, L.C.*, Nos. 04-17602, 06-1220, 2010 WL 1417732 (Bankr. S.D. Fla. Apr. 6, 2010) ......................................................................................... 18

*In re Ryan*, 443 B.R. 395 (Bankr. N.D. Tex. 2010) ........................................... 21, 24

*In re Soporex, Inc.*, 446 B.R. 750 (Bankr. N.D. Tex. 2011) ..................................... 19

*Indem. Ins. Co. of N. Am. Aviation, Inc.,* 891 So.2d 532 (Fla. 2004) ........................ 16

*Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193 (Tex. 2002) ............................ 20

*Kayser v. McClary*, 875 F. Supp. 2d 1167 (D. Idaho 2012) ...................................... 16

*Kelly v. Ga.-Pacific LLC*, 671 F. Supp. 2d 785 (E.D.N.C. 2009) ............................... 14

*King v. Dogan*, 31 F.3d 344 (5th Cir.1994) ................................................................ 8

*Latham v. Burgher*, 320 S.W.3d 602 (Tex. App.—Dallas, 2010, no pet.) ............ 21, 22

*Longman v. Physicians Res. Grp., Inc.*, No. 97-cv-3102, 2003 WL 22244675 (N.D. Tex. Sept. 30, 2003) ............................................................................................... 8

*Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226 (Tex. 1990) ...................................... 25

*Michael v. Estate of Kovarbasich*, No. 14 -cv-0212, 2015 WL 5725814 (N.D.W. Va. Sept. 29, 2015) ....................................................................................................... 17

*Mitchell Energy Corp. v. Martin*, 616 F. Supp. 924 (S.D. Tex. 1985) .................. 11, 12

*Nazareth Int'l, Inc. v. J.C. Penney Corp., Inc.*, 2005 WL 1704793 (N.D. Tex. July 19, 2005) ............................................................................................................... 16

*Open Source Grp. LLC v. Patel*, No 13-cv-3755, 2015 WL 11120540 (N.D. Tex. May 28, 2015) ........................................................................................................ 7

*Pocahontas Mining Co. Ltd. P'ship v. Oxy USA, Inc.*, 503 S.E.2d 258 (W. Va. 1998) ................................................................................................................................ 18

*Reese v. Pook & Pook, LLC.*, 158 F. Supp. 3d 271 (E.D. Pa. 2016) .......................... 15

*Richmond v. Madison Mgmt. Grp.*, 918 F.2d 438 (4th Cir. 1990) ...................................................16

*RMA Lumber, Inc. v. Pioneer Mach., LLC*, No. 08-cv-00023, 2009 WL 3172806
    (W.D. Va. October 1, 2009)......................................................................................................16

*S.E.C. v. Sharp Capital, Inc.*, No. 98-cv-2792, 1999 WL 242691 (N.D. Tex. Apr.
    16, 1999) .....................................................................................................................................9

*SEC v. Brady*, No. 05-cv-1416, 2006 WL 1310320 (N.D. Tex. May 12, 2006) ........................9

*SEC v. Diversified Indus. Inc.*, 465 F. Supp. 104, 111 (D.D.C. 1979)........................................9

*Sparling v. Doyle*, No. 13-cv-00323, 2014 WL 12489990 (W.D. Tex. Oct. 23,
    2014)................................................................................................................................... 23, 25

*Trinity Glass Int'l, Inc. v. LG Chem, Ltd.*, No. 09-cv-5018, 2010 WL 2720835
    (W.D. Wash. July 8, 2010).......................................................................................................14

*United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207 (10th Cir. 2000)
    ........................................................................................................................................... 16, 17

*Van Duzer v. U.S. Bank*, 995 F. Supp. 2d 673 (S.D. Tex. 2014) ............................................6, 7

*Vibra-Tech Engineers, Inc. v. Kavalek*, 849 F.Supp.2d 462 (D. N.J. 2012)..............................11

*Wilson v. Birnberg*, 569 F. App'x 343 (5th Cir. 2014) ...............................................................8

**Statutes**

Tex. Bus. Orgs. Code § 21.223 ........................................................................................... 21, 23

**Rules**

Fed. R. Civ. P. 12(c)...............................................................................................................passim

**Treatises**

5C Wright & Miller, *Federal Practice & Procedure* § 1371 (West 3d ed. 2017) ....................6, 7

Restatement (Third) of Restitution and Unjust Enrichment § 51
    cmt. e (2011)..............................................................................................................................20

# INTRODUCTION

Despite their repeated attempts to obstruct discovery, Antero uncovered evidence that Tommy Robertson and his companies engaged in a widespread kickback scheme to corrupt Antero personnel and ultimately defraud Antero. The scheme involved payoffs over $1 million, free flights on private jets, and possibly even a free jet. Robertson's companies monopolized Antero's West Virginia operations and maintained the monopoly despite demonstrably deficient work, enabling them—and Robertson—to extract over $200 million from Antero. This kickback scheme is a textbook tort claim entitling Antero to disgorge the monies Robertson and his companies improperly obtained.

Yet, Robertson now asks the Court to—as a matter of law—shield him from even answering Antero's tort claims on the merits. He wants the Court to ignore the record evidence showing millions of dollars in payoffs and benefits—evidence that Antero only obtained after Judge Cureton admonished the defendants. Robertson is trying to use his discovery misconduct to his advantage and blame Antero for not including allegations based on the documents that he was actively concealing.

The Court should reject his Rule 12(c) motion for the following reasons:

➢ The motion asks the Court to view the complaint—and the case—in a vacuum and ignore the substantial record evidence of misconduct. This a) conflicts with Rule 12(c)'s purpose of only disposing of cases where the facts are undisputed, b) is mooted by Antero's amended complaint, and c) is conflicts with the prohibition against multiple summary judgment motions.

➢ Robertson's defense based on the economic loss rule suffers from multiple, fundamental flaws. First, Robertson was not a party to any applicable contract with Antero, which is necessary for the rule to even apply. Second, the prohibition against defrauding Antero and corrupting its employees arises under tort law, not contract law. For the economic loss rule to apply, Antero's tort claims must be "created solely by contract." Consistent with its tort claims arising outside of any contract, Antero seeks equitable remedies like disgorgement, not benefit-of-the bargain damages. The rule is simply inapplicable.

➢ Antero's veil-piercing allegations are properly pleaded. Antero has alleged that Robertson used the defendant companies to perpetrate a fraudulent kickback scheme and "work an injustice" by dissolving—on the day he learned of the lawsuit—the company that extracted the most money from the scheme. There is also specific evidence of commingling, including shifting loans between Robertson and his companies for which there is no evidence of any intent to repay.

## BACKGROUND

### A.      Antero's Operations

Antero primarily engages in the development of natural gas plays around the country. The defendants in this action are Tommy Robertson and his affiliated companies.[1] The pending motion under Rule 12(c), to which this brief responds, was filed on behalf of Robertson in his individual capacity.[2]

Around 2012, the Robertson defendants began providing services for Antero's operations in West Virginia. John Kawcak, Antero's top operational employee in West Virginia, hired the vendors that Antero used in West Virginia. Without explanation, the Robertson defendants quickly obtained a monopoly over the West Virginia operations despite their demonstrably substandard work and the availability of other vendors. Vendors that had previously provided work for Antero were shut out. (*See* doc. 253-1 ¶¶50, 52, 105.)

Prior to June 2013, no written document governed the relationship between Antero and the Robertson defendants. Antero moved to formalize its relationship with its vendors, in part through the use of Master Services Agreements ("MSAs"). (Doc. 149 at 6.) Despite previous denials, the defendant companies now admit that those MSAs are valid contracts that govern their relationship with Antero. (Doc. 149 at 6.) Notably, Tommy Robertson never signed a contract with Antero. (Ex. 8, Appx. 069.)

---

[1] Tommy Robertson's affiliated companies are C&R Downhole Drilling, Inc. and C&R Downhole Drilling, LLC (collectively, "C&R Downhole"); Black Diamond Hot Shot, LLC ("Black Diamond"); STRC Oilfield Technology, LLC ("STRC"); and Big Tex Well Services, LLC ("Big Tex").

[2] Three business day before this response was due, the defendants companies filed a motion seeking "joinder" with Robertson's individual motion. (Doc. 260.) Antero will respond to any arguments unique to the defendant companies in a separate brief filed in accordance with the timing set forth in Local Rule 7.1(e).

### B.    This Litigation

Antero sued the Robertson defendants in December 2015, asserting various causes of action, including breach of contract. The contract claims were based on the defendant companies' violations of their MSAs with Antero, specifically overbilling and failing to meet the strict performance standards in the MSAs. When it filed suit (and for months thereafter), Antero had no hard evidence about Robertson's kickback scheme to corrupt the Antero personnel tasked with hiring vendors, overseeing operations, and supposedly representing Antero's interests.

When Antero asked for evidence of payments or benefits they gave to senior Antero personnel like John Kawcak, Jeff Partridge, and Landon West, the Robertson defendants disclaimed the existence of any payments, expressly stating "no documents have been identified that are responsive to this request." [3] (Ex. 1, Appx. 015-016.) Accordingly, the operative complaint did not include allegations about the payoff and kickback scheme.

### C.    The Robertson defendants continued to stonewall Antero's attempts to uncover the kickbacks and benefits they provided to Antero personnel.

Over the Robertson defendants' objections, Antero continued to seek evidence of the payments to Antero personnel. Antero filed motions to compel on August 31, 2016 and April 10, 2017, seeking evidence of the payoff scheme. (Docs. 62 and 156.) Judge Cureton granted Antero's request for documents each time. (Docs. 90, 175.) Yet, the Robertson defendants refused to comply with Judge Cureton's orders, which forced Antero to move to enforce the prior orders. (Doc. 187.) Judge Cureton granted Antero's motion, noting that the court "ha[d] grown tired" of "tactics in contravention of the principles set forth in *Dondi*." (Doc. 217 at 2.).

Antero also had to move to compel Kawcak's compliance with a Rule 45 subpoena seeking

---

[3] Kawcak was Antero's top operational employee in West Virginia. Partridge and West were "Completions Managers," reported directly to Kawcak and were supposed to manage the Antero personnel representing Antero's interests on the individual wellsites.

evidence of the payments and benefits that he took from the Robertson defendants. Judge Cureton granted that motion to compel, and Kawcak completed his production in February 2018. (Doc. 253 at 5–6.)

> **D.    Antero uncovers a widespread kickback scheme under which Tommy Robertson corrupted the key Antero personnel working in West Virginia.**

The documents produced in response to the motions to compel revealed that Robertson and his companies executed a broad kickback scheme. These payments benefited the defendant companies because they were able to obtain a monopoly over Antero's operations, but the companies did not directly fund the transactions. Rather, the payments originated either from Robertson's personal accounts, his companies, or other accounts under his control. Examples of the payments include:

| Date | Payor | Payee | Amount |
|---|---|---|---|
| Oct. – Dec. 2012 | Double R Traffic (*via Tommy Robertson*)[4] | John Kawcak | $729,000 |
| March – June 2014 | Tommy Robertson | Jeff Partridge | $409,000 |
| Oct. 2014 - May 2015 | TWR Holdings, LLC[5] | John Kawcak (*via J. Raab, and JK Oilfield*)[6] | $119,656.19 |
| Nov. 2014 | Tommy Robertson | Landon West | $100,000 |

(*See* Ex. 9-13 and 15, Appx. 072-089 and 094) (providing documentation of transfers).)

In addition to these payments, Antero uncovered documents showing that Tommy Robertson gave Kawcak a jet, paid for Kawcak's use of the jet, and paid Kawcak for each well that the defendant companies worked on. (*See* Docs. 253 at 7; 253-1 ¶42.) Antero only obtained this information after Judge Cureton granted Antero's motion to compel Kawcak to produce documents.

---

[4] Double R Traffic was a company under Tommy Robertson's control.
[5] TWR Holdings LLC is a holding company under Tommy Robertson's control
[6] Jennifer Raab is Kawcak's wife.

**E.     Antero's proposed amended complaint—as well as the current operative complaint—seek both contract damages and non-contract damages arising in tort law.**

On March 8, 2018, Antero conferred with counsel for the Robertson defendants concerning Antero's intention to seek leave to amend the complaint in light of Kawcak's deposition testimony and the payments and benefits recently uncovered. (Ex. 19, Appx. 127.) Antero moved for leave to amend on March 14, 2018, but not before Tommy Robertson filed his motion pursuant to Rule 12(c) hours before knowing that Antero was preparing to file an amended complaint. (*See* doc. 252, 253.) The proposed complaint cites extensively to the kickback scheme and adds causes of action for aiding and abetting breach of fiduciary duty, civil conspiracy, and RICO, as well as continuing to assert claims for fraud and contract breach. (Doc. 253–1 ¶¶35–66, ¶¶106–128.)

**1.   Antero's contract damages**

Antero's contract claims are based on the MSAs with the defendant companies and seek benefit-of-the-bargain/expectation damages. Because Robertson did not have an MSA with Antero personally, Antero does not seek contract damages from him (the veil-piercing allegations notwithstanding). Generally, the contract damages fall into two categories. First, damages for charging a price that differed from the published price list. For example, Big Tex's price list stated that a "supervisor vehicle" was $150, but Big Tex charged $175 per truck, thus resulting in a $25 overcharge. Second, Antero seeks damages stemming from the defendant companies failing to provide work that complied with the strict performance standards in the MSAs. (Doc. 149 at 6–7.))

**2.   Antero's tort claims seek disgorgement, restitution, and other equitable gains-based remedies, but do not seek expectation or benefit-of-the-bargain damages.**

In contrast with the expectation damages that it seeks under the contract, Antero seeks additional equitable remedies such as disgorgement or restitution for its tort claims. Antero supplemented its Rule 26(a)(1)(A)(iii) disclosures on July 21, 2017, to expressly state that it was seeking

to recover "through disgorgement, restitution, and or other gains-based remedies" the "total amount of money that Antero paid to the respective defendants" based on the theory that the Robertson defendants obtained these monies "through improper means and misconduct." (Ex. 3, Appx. 029-032.) These equitable remedies are completely separate and apart from the damages that Antero seeks to recover under the contracts.[7] Antero has again supplemented its disclosures to note that the equitable, gains-based remedies also apply to the causes of action that it added through the proposed amended complaint—specifically the causes of action for aiding and abetting breach of fiduciary duties, civil conspiracy, and RICO. (Ex. 21, Appx. 131–137.)

## ARGUMENT

### I.   <u>Tommy Robertson's Rule 12(c) motion is procedurally improper.</u>

Robertson's motion improperly asks the Court to view the complaint—and the case—in a vacuum and ignore the substantial record evidence of his misconduct. This approach a) conflicts with the fundamental purpose of Rule 12(c), b) represents an attempt to avoid the Local Rule's prohibition against multiple summary judgment motions, and c) is otherwise mooted by Antero's proposed third amended complaint.

Robertson's motion for judgment on the pleadings improper at this late stage in the case. The "pleadings rarely provide a sufficient basis for judgment on the merits." 5C WRIGHT & MILLER, *Federal Practice & Procedure* § 1371 (West 3d ed. 2017). Rule 12(c) motions are "designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Van Duzer v. U.S. Bank*, 995 F. Supp. 2d 673, 684 (S.D. Tex. 2014) (quotations omitted). The motion is proper when "only questions

---

[7] Antero has subsequently supplemented its disclosures to note that the equitable, gains-based remedies also apply to the causes of action that it added through the proposed amended complaint—specifically the causes of action for aiding and abetting breach of fiduciary duties, civil conspiracy, and RICO. (Ex. 21, Appx. 131–137)

of law remain to be decided by the district court." *Open Source Grp. v. Patel*, No. 13-3755, 2015 WL 11120540, at *2 (N.D. Tex. May 28, 2015) (quoting 5C WRIGHT & MILLER § 1367).

Because of the limited circumstances under which judgment on the pleadings is appropriate, "[i]n practice, the great majority of Rule 12(c) motions eventually are converted into motions for summary judgment." *EEOC v. UPS*, No. 15-cv-4141, 2018 WL 1402240, at *11 (E.D.N.Y. Mar. 5, 2018) (quoting 5C WRIGHT & MILLER § 1371). "[I]t usually is necessary to introduce supporting affidavits and other written documents to prove that no triable issue of fact actually is in dispute" given "the simplified pleading practice sanctioned by the federal rules." 5C WRIGHT & MILLER § 1371.

The circumstances of this case fall squarely within the "great majority of 12(c) motions" that cannot be decided without considering the factual record because there are factual disputes on core points. *Id.* It took Antero roughly two years and multiple motions to compel and a motion to enforce to reveal the extent of Robertson' kickback scheme. Now, with the close of discovery weeks away, Robertson asks the Court to totally disregard this evidence. Further, nothing prevents the Court from considering evidence of the payoff scheme. *Van Duzer*, 995 F. Supp. 2d at 684 (noting that "it is well-settled that it is within the district court's discretion whether to accept extra-pleading matter on a motion for judgment on the pleadings") (internal quotations omitted).

No doubt, Robertson's request to ignore the record evidence of his payoff scheme is contrary to Rule 12(c)'s purpose of "dispos[ing] of cases where the material facts are not in dispute." *Id.* But it is also impractical. A plaintiff should not need to amend its complaint each time it uncovers relevant facts in discovery to protect against a defendant moving for judgment on the pleadings. Such an approach is inconsistent with the "pleading practice sanctioned by the federal rules," 5C WRIGHT & MILLER § 1371, and would undercut their purpose of "secur[ing] the just, speedy, and inexpensive determination of every action and proceeding, FED. R. CIV. P. 1. Simply put, the Court cannot properly consider Tommy Robertson's motion for judgment on the pleadings without converting it to a motion

for summary judgment and considering the record evidence of the kickback scheme.

While a motion for summary judgment would be the proper way in which to test the sufficiency of Antero's claims in light of the record evidence, Robertson instead chose to attack the claims through a Rule 12 motion because a) he stands no chance of success when the evidence of his kickbacks is considered and b) because he and the defendant companies have already used the one summary judgment motion that the Local Rules' permit. (*See* L.R. N.D. Tex. 56.2(b) (permitting "no more than one motion for summary judgment").)

Finally, Antero's motion to amend the complaint to add factual allegations and additional causes of action concerning the kickback scheme moots Robertson's motion. (Doc. 253.) "An amended complaint supersedes the original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading." *Wilson v. Birnberg*, 569 F. App'x 343, 348 (5th Cir. 2014) (quoting *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994)); *see also Longman v. Physicians Res. Grp., Inc.*, No. 97-cv-3102, 2003 WL 22244675, at *3 (N.D. Tex. Sept. 30, 2003) (noting that with "the filing of Plaintiffs' Second Amended Complaint, Defendants' motion to dismiss Plaintiffs' Amended Complaint was rendered moot").[8] Robertson filed his Rule 12(c) motion knowing that Antero's amended complaint was forthcoming, and rushed to file the motion in hopes of avoiding the amended allegations detailing the kickback scheme.

Because of the record evidence of his misconduct and Antero's pending motion for leave to amend, the Court should deny Robertson's motion for judgment on the pleadings because it is the inappropriate vehicle with which to test Antero's claims.

---

[8] Under certain circumstances, none of which are present here, the filing of an amended complaint would not moot a pending motion to dismiss—for example, when the complaint "does not add new parties or claims" and parties' conduct "suggests they do not believe the amended complaint rendered the motion to dismiss moot." *Bell v. Moawad Grp.*, No. 17-ca-00073, 2017 WL 2841679, at *2, n.1 (W.D. Tex. June 30, 2017).

## II.   Antero has pleaded its fraud claim with sufficient particularity.

### A.   Tommy Robertson misstates Rule 9(b)'s standard

Robertson assumes that Rule 9 requires a strict, one-size-fits-all pleading standard. In doing so, he disregards the important role the factual context plays in the analysis of Antero's claims. *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000) (noting that "the particularity demanded by Rule 9(b) differs with the facts of each case"). Importantly, Rule 9(b) does not require that a complaint be pleaded with surgical precision because "punctilious pleading detail" is not required. *SEC v. Brady*, No. 05-cv-1416, 2006 WL 1310320, at *3 (N.D. Tex. May 12, 2006) (quoting *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 273 (N.D. Tex. 1990)).

Fraud allegations are sufficiently particular when they "facilitate a defendant's ability to respond to and <u>prepare</u> a defense to a charge of fraud." *S.E.C. v. Sharp Capital*, No. 98-cv-2792, 1999 WL 242691, at *1 (N.D. Tex. Apr. 16, 1999) (emphasis added). "Rule 9(b) serves three purposes: [f]irst, the Rule ensures that defendants receive fair notice of the plaintiffs' claims; second, it protects the defendants' reputations from unfounded allegations of improper conduct, and third, . . . prevent[s] the institution of strike suits." *Cypress/Spanish Ft. I, L.P. v. Prof'l Serv. Indus.*, 814 F. Supp. 2d 698, 712 (N.D. Tex. 2011) (quoting *In re Urcarco Secs. Litig.*, 148 F.R.D. 561, 564 (N.D. Tex. 1993)). Accordingly, pleading the "details of the scheme" satisfies Rule 9(b) when it apprised the defendants of the basic transactions and enabled them to prepare a defense. *Sharp Capital*, 1999 WL 242691, at *1.

### B.   Antero's fraud allegations—based on the kickback scheme that Robertson orchestrated—are sufficiently particularized and give him fair notice to "prepare a defense."

Robertson takes the incredible position that Antero has not pleaded a plausible fraud claim when Antero has provided allegations of a wide-ranging kickback scheme and pointed to the specific payoffs and corrupting benefits upon which the scheme was founded. His contention is belied by countless decisions from within the Northern District of Texas and elsewhere.

A recent case from the Northern District of Texas, *Cypress/Spanish v. Professional Service Industries*, 814 F. Supp. 2d 698, 712 (N.D. Tex. 2011), should control because it arose under similar circumstances as Robertson's payoff scheme against Antero—though the misconduct and scope of the scheme in *Cypress/Spanish* pales in comparison to the present case. In *Cypress/Spanish*, the defendants were a group of contractors tasked with constructing a shopping center. Like Antero, the plaintiff in *Cypress/Spanish* alleged that they corrupted the entity that the plaintiff had tasked with supervising the construction work using, among other things, "kickbacks to participating employees" to cover up fraud that involved a) "concealing failing test results," b) "instructing . . . employees not to report . . . misconduct," and c) failing "to properly staff" the project. *Id.* at 705, 712.

The court rejected the defendant's contention that the plaintiff "failed to satisfy the particularity requirements of Rule 9(b) because Plaintiff . . . failed to identify any specific reports, summaries, or other documents . . . furthering a fraudulent scheme." *Id.* at 712. The court began by noting that the "focal point of a court's inquiry is whether the pleading satisfies the purpose[]" of Rule 9(b) and "ensur[ing] that defendants receive fair notice of the plaintiffs' claims. *Id.* (internal quotations omitted). All the plaintiff had to do was specify "the period of time during which the alleged frauds were perpetrated," "the location," "the nature of the fraud," and "how the participants profited." *Id.* The plaintiff in *Cypress/Spanish* satisfied Rule 9(b):

- Simply stating that the fraud began "from the start" of the project was sufficient to plead the "period of time";

- Simply naming "Spanish Fort, Alabama" as the location was sufficient;

- Identifying the "mailing and emailing of false reports that concealed the poor performance" showed "the nature of the fraud"; and

- Alleging that the defendants profited from their scheme based on the "payment of funds for services that were never rendered or that were rendered deficiently, as well as kickbacks to participating employees" showed how the "participants profited from the . . . conspiracy." *Id.*

The *Cyprus/Spanish* court cited approvingly to another case from within the Fifth Circuit,

*Mitchell Energy Corp. v. Martin*, 616 F. Supp. 924 (S.D. Tex. 1985). The court in *Mitchell* ruled that a complaint alleging a kickback scheme satisfied Rule 9(b) by:

> specif[ying] a period of time during which the alleged frauds were perpetrated, *i.e.,* January, 1977–November, 1982; the location, Houston; the nature of the fraud, kickbacks for payments for goods and services which Plaintiff never received; and the parties involved in the fraud, the Defendants.

*Id.* at 927–928.

The holdings in *Cypress/Spanish* and *Mitchell* are in accord with other decisions from around the country evaluating fraud and kickback schemes under Rule 9(b). For example, in *Vibra-Tech Engineers, Inc. v. Kavalek*, 849 F. Supp. 2d 462 (D. N.J. 2012), the fraud claim was based on the defendant causing the plaintiffs to purchase equipment from a company in which the defendant had an interest. The fraud was accomplished, in part, through false invoices that the defendant prepared and submitted. *Id.* at 494–495. The court concluded that the allegations satisfied Rule 9(b) because they alleged that the defendant (1) intended to defraud the plaintiff, (2) caused the plaintiff to purchase items at a higher price than was necessary, and (3) injured the plaintiff. *Id* at 495; *see also Williams Elecs. Games, Inc. v. Barry*, 42 F. Supp. 2d 785, 789, 795 (N.D. Ill. 1999) (denying motion to dismiss RICO claim where "plaintiff has alleged a scheme lasting almost eight years involving . . . thousands of fraudulent invoices," which were part of "a scheme in which [a representative of the plaintiff] disregarded [his] duties by placing orders with defendants . . . for components that were priced above those available from approved vendor"); *Gibbs v. Primelending*, No. 10-cv-0293, 2010 WL 4056146, at *4 (E.D. Ark. Oct. 14, 2010) (allegations that employees of real estate lending and title companies "participated in [a] kickback scheme" relating to the refinancing of a house satisfied Rule 9(b)).

With the benefit of the documents that the Robertson defendants produced in response to Antero's motions to compel, Antero's proposed complaint sets forth in painstaking detail Robertson's and the rest of the defendants' kickback scheme. (*See* doc. 253-1 ¶¶35–66.) The complaint identifies the specific date and amount of each payment that Tommy Robertson or companies under his control

made in furtherance of the scheme.[9] In addition to the corrupting payments, Antero has also alleged that Robertson provided additional benefits in the form of free flights and even a free private jet, including identifying the specific flights to which the benefits pertained. (Doc. 253-1, ¶47, Ex. 9-15, Appx 072–094.)

Antero further alleged that the purpose of the payoff scheme was "to maintain a monopoly over Antero's West Virginia operations in spite of demonstrably deficient work . . . and show how the Robertson defendants hacked the system that Antero had in place to verify that work was actually provided." (Doc. 253-1 ¶62.) Antero's specific allegations concerning Robertson's kickback scheme far exceed the level of detail contained in *Cypress/Spanish* and *Mitchell*, cases where the courts rejected the defendants' arguments that the allegations did not satisfy Rule 9(b).

Moreover, Robertson's own conduct belies any claim that he does not understand that Antero's tort claims are based on the kickback scheme to corrupt Antero personnel. The payments to Antero personnel were the subject of multiple motions to compel and a motion to enforce that Robertson opposed. And Robertson's lawyer tried to elicit deposition testimony suggesting non-fraudulent purposes for the payments. (Ex. 4, Appx. 035; Ex. 5, Appx. 040–041.) Accordingly, Robertson cannot credibly say that he has not "receive[d] fair notice of the plaintiffs' claims" relating to the kickback scheme to satisfy the purpose of Rule 9(b). *Cypress/Spanish*, 814 F. Supp. 2d. at 712.

Critically, Robertson's motion altogether fails to address, let alone acknowledge, the specific allegations and record evidence of his participation in the payoff scheme. Instead of acknowledging the corrupting payments, Robertson myopically attacks the "vague generalities" in the operative complaint, allegations that Antero made in June 2016 when Robertson was actively disclaiming that

---

[9] (*See* Doc. 253-1 ¶¶47, 57, 60 (noting the $150,000 payment to Kawcak on October 10, 2012; the $79,000 payment to Kawcak on October 17, 2012; the $500,000 payment to Kawcak on December 6, 2012; $100,000 payment to West in November 2014, and $409,000 in payments to Partridge between March 2014 and 2015).)

any payments existed and fighting Antero's efforts to obtain the full story. (Doc. 252 at 4.) His statements were false, which resulted in Judge Cureton' admonishment.

But now Robertson is now trying to use his discovery misconduct to his advantage. He is blaming Antero for not including sufficient allegations of the fraud, yet he was the one who affirmatively stated that no payments existed and actively fought Antero's access to them. The Federal Rules do not sanction such conduct. *Cf. Felman Prod., Inc. v. Indus. Risk Insurers*, No. 09-cv-0481, 2010 WL 3119338, at *4 (S.D. W. Va. July 28, 2010) (noting that a defendant's delays in producing discovery should not prevent amendment because a plaintiff "should be permitted opportunity to review all the evidence responsive to its requests' before seeking amendment").

Accordingly, the Court should reject Robertson's attempts ignore the evidence of his participation in the scheme and deny his motion under Rule 12(c).[10] Because Antero's fraud allegations are sufficient, its claims for negligent misrepresentation are sufficiently pleaded as well.

### III.   <u>Neither the gist of the action doctrine, economic-loss rule, nor any other related rule bars Antero's tort claims.</u>

Robertson contends that the gist of the action doctrine bars Antero from asserting tort claims and limits recovery to expectation damages between Antero and the defendant companies. The gist of the action doctrine is materially similar to the economic loss rule in most other states, as Robertson's motion recognizes. (Doc. 252 at 9.)[11] For consistency, this motion generally refers to the two doctrines

---

[10] The Court can do this in two ways. First, by granting Antero's motion for leave to amend to file the proposed amended complaint that lays out the fraud and kickback scheme in exacting detail. (Doc. 253.) Second, and in the alternative, the Court should consider the full record, including all of the payments and benefits noted earlier and in Antero's proposed amended complaint. Antero emphasizes if the Court chooses the second option—not strictly limiting the analysis to the pleadings— Robertson's Rule 12(c) must fail, but Antero's motion seeking leave to amend is not mooted. The proposed amended complaint is critically important for asserting the additional causes of action for aiding and abetting breach of fiduciary duty, civil conspiracy and RICO.

[11] The principles of the "gist of the action" doctrine in states like West Virginia and Pennsylvania have been incorporated into the larger economic loss doctrine applied in most states. *Geesey v.*

collectively as the "economic loss rule" because that is the common name for the doctrine.

Robertson's invocation of the economic loss rule is fundamentally flawed for at least two reasons. First, Robertson was not a party to any applicable contract with Antero, which is a threshold requirement for the rule to even apply. Second, Robertson ignores the established exceptions to the rule for intentional torts like the kind that Antero alleged that he committed. The prohibition against Robertson corrupting Antero's employees and defrauding Antero does not arise from any bargain between him and Antero, but rather arises from the social duty that the law of torts imposes. If there was any doubt, Antero has repeatedly said that its tort claims do not seek expectation damages derived from the MSAs with the defendant companies, but rather disgorgement and other equitable remedies.

### A.    Robertson's reliance on the economic loss rule fails at the threshold because there was no contract between him and Antero.

Courts regularly reject defenses based on the economic loss rule where, as here, there is no contract between the parties. "[W]ithout a contract there is no basis to apply the economic loss rule." *Impac Warehouse Lending Grp., Inc. v. Gen. Mortg. Corp. of Am.*, No. 04-cv-418, 2006 WL 1877095, at *3 (M.D. Fla. July 6, 2006); *see also Trinity Glass Int'l, Inc. v. LG Chem, Ltd.*, No. 09-cv-5018, 2010 WL 2720835, at *6 (W.D. Wash. July 8, 2010) (stating that "the economic loss rule applies only when there is a contract" and rejecting "argu[ment] that a contract is not required in order for the economic loss rule to apply").[12] A federal district court specifically applying the gist of the action doctrine cited the lack of a contract between the parties as a basis for not applying the rule, stating "[t]he obvious flaw

---

*CitiMortgage, Inc.*, 135 F. Supp. 3d 332, 352 (W.D. Pa. 2015) ("The economic loss doctrine is closely related to the gist of the action doctrine. Both doctrines share the common purpose of "maintaining the separate spheres of the law of contract and tort.") (internal quotations omitted).

[12] The only exception to the rule requiring a contract between the parties is when, despite the absence of a contract, the "plaintiff has a contract or warranty remedy against [the] defendant." *See, e.g., Kelly v. Ga.-Pacific LLC*, 671 F. Supp. 2d 785, 795 (E.D.N.C. 2009). This exception does not apply in the present case because Antero has no "contract or warranty remedy" against Robertson. The contract remedies are only available against the defendant companies.

in Lowe's gist of the action argument is that there is no allegation that there is 'a contract between the parties.'" *Reese v. Pook & Pook, LLC.*, 158 F. Supp. 3d 271, 299 (E.D. Pa. 2016).

In this case, there is no contract between Robertson and Antero. The applicable contracts are the MSAs between Antero and the defendant companies. Like in *Reese*, there is an "obvious flaw in [Robertson's] gist of the action argument." *Id.*

Further, Robertson cannot piggyback off the defendant companies' MSAs. In *Impac Warehouse*, a federal district court in Florida rejected a similar argument. 2006 WL 1877095, at *3. In that case, a lending company sued the owner of a mortgage company in the owner's individual capacity. There was no contract between the plaintiff and the defendant, though the defendant did sign a contract on behalf of the mortgage company. *Id.* Citing the fact that she signed the contract on behalf of the mortgage company, the defendant tried to invoke the economic loss rule. But the court rejected it, noting that the owner-defendant "signed the contract in her capacity as President [of the mortgage company]," and because "neither defendants are parties to the contract in their individual capacities, the economic loss rule does not apply." *Id.*

Because, Tommy Robertson is not a party to any applicable contract with Antero, the Court must reject at the threshold his attempt to invoke the economic loss rule.

**B.     Tommy Robertson ignores the established exceptions to the economic loss rule for intentional torts and ignores the fact that tort law, not any contract, prohibits him from defrauding Antero and corrupting its employees.**

Even assuming that Robertson has a threshold basis to invoke the economic loss rule—which he does not because there is no contract between him and Antero—the rule still does not apply because a) Robertson's individual liability stems from his efforts to defraud Antero by corrupting its employees and b) Antero seeks non-contract remedies for its tort claims.

**1.     Robertson's individual liability does not arise from any contract with Antero, but rather tort law, thus rendering the economic loss rule inapplicable.**

The economic loss rule, where it does apply, only bars tort claims in which "the claim is for

breach of duty <u>created solely by contract</u> rather than a duty imposed by law" and "the injury is <u>only</u> the economic loss to the subject of the contract itself." *Nazareth Int'l, Inc. v. J.C. Penney Corp.*, 2005 WL 1704793 at \*7 (N.D. Tex. July 19, 2005) (emphasis added); *see also United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1226–27 (10th Cir. 2000) (stating that the economic loss rule precludes recovery in tort only when "the duty breached is a contractual duty"); *Richmond v. Madison Mgmt. Grp.*, 918 F.2d 438, 446 (4th Cir. 1990) (applying Virginia law and recognizing fraud claim not barred because of a contract; "if, when the surface is scratched, it appears that the defendant has breached a duty imposed by law, not by contract, the economic loss rule should not apply"); *RMA Lumber, Inc. v. Pioneer Mach., LLC*, No. 08-cv-00023, 2009 WL 3172806, at \*7, n.4 (W.D. Va. October 1, 2009) (recognizing that "under the economic loss rule, a plaintiff cannot recover for a purely economic loss except in the case of an intentional tort").[13]

Thus, "a rule barring recovery for economic loss is not an escape hatch from intentional commercial torts." *Indem. Ins. Co. of N. Am. Aviation, Inc.*, 891 So.2d 532, 543 n.3 (Fla. 2004). And the consensus is to read the rule narrowly. *Livery Coach Sols. v. Music Express/East, Inc.*, 245 F. Supp. 3d 639, 646 (D. Del. 2017) (noting "trend to exclude intentional torts, including fraudulent misrepresentation, from economic loss doctrine"). Because the duty must arise "solely by the contract," it is not enough that the fraud and contract claims involve overlapping facts. *See Dommel Props. LLC v. Jonestown Bank & Tr. Co.*, 626 F. App'x 361, 365 (3d Cir. 2015) (noting the rejection of the "inextricably intertwined" test under the gist of the action doctrine). Rather, "the 'source of duty' inquiry is the 'touchstone standard for ascertaining the true gist . . . of a claim.'" *Id.* (quoting *Bruno v.*

---

[13] *See also Indem. Ins. Co. of N. Am. Aviation, Inc.,* 891 So.2d 532, 543 n.3 (Fla. 2004) (noting that "[i]ntentional tort claims such as fraud, conversion, intentional interference, civil theft, abuse of process, and other torts requiring proof of intent generally remain viable" despite economic loss doctrine); *EED Holdings v. Palmer Johnson Acquisition Corp.,* 387 F. Supp. 2d 265, 278–79 (S.D.N.Y. 2004) (allowing fraud claim to go forward because New York law permits recovery of economic loss on claims of fraud and fraud in the inducement even "in tandem" with contract claims); ) *Kayser v. McClary*, 875 F. Supp. 2d 1167, 1175–76 (D. Idaho 2012) (collecting cases).

*Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014)). The contract must be an "essential ground" under which the tort claims arise. *Patel v. Patel*, No. 14-cv-5845, 2016 WL 3000821, at *3 (E.D. Pa. May 25, 2016).

Indeed, the rationale behind the economic loss rule does not apply where, as here, the fraudulent conduct permeates a contractual relationship. The Tenth Circuit explained in *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1227 (10th Cir. 2000), that "where it appears two parties have in good faith entered into a contract but, in actuality, one party has deliberately made material false representations of past or present fact, has intentionally failed to disclose a material past or present fact . . . [t]he breaching party in this latter situation also is a tortfeasor and may not utilize the law of contract to shield liability in tort for the party's deliberate or negligent misrepresentations."

Although the West Virginia Supreme Court has not definitively opined on the issue, authorities and explanatory rationales from jurisdictions which have addressed it demonstrate why the economic loss rule does not shield Robertson under the *Erie*-guess required of this Court. In tort cases, West Virginia regularly follows the Restatement (Second) of Torts, which reads the economic loss rule narrowly like other jurisdictions. *See, e.g.*, *Michael v. Estate of Kovarbasich*, No. 14 -cv-0212, 2015 WL 5725814, at *11 (N.D.W. Va. Sept. 29, 2015) ("To better define "active concealment, the West Virginia Supreme Court of Appeals seems to adopt the definition laid out in the Restatement (Second) of Torts."); *Carroll v. W. Virginia Reg'l Jail & Corr. Facility Auth.*, No. 14-cv-17012, 2015 WL 1395886, at *3 (S.D.W. Va. Mar. 25, 2015) (adopting the Restatement's state-of-mind definition). Robertson has pointed to nothing suggesting that West Virginia would adopt some alternate application of the rule that is necessary for him to have a chance of prevailing.

To accept Robertson's argument (notwithstanding the fact that there is no contract between him and Antero), the Court must find that Antero's tort claims for fraud, aiding and abetting breach of fiduciary duty, etc. arise solely from some contractual duty and are thus synonymous with a breach of contract claim. But they do not.

17

Antero is not seeking expectation damages in the guise of a tort claim. Robertson's <u>individual</u> liability to Antero arises from his efforts to defraud Antero and corrupt its employees, and the prohibition against such conduct does not arise from any contract between Antero and Robertson (indeed no such contract exists). Rather, the prohibition arises from the common law duty not to mislead another to the latter's detriment whether that be through affirmative misrepresentation or failure to tell the whole truth when one has chosen to speak. *See generally Pocahontas Mining Co. Ltd. P'ship. v. Oxy USA, Inc.*, 503 S.E.2d 258, 264 (W. Va. 1998). Obviously, the prohibition against defrauding Antero through the payoff and kickback scheme is not something for which Antero or any other company would bargain. No party contracts to prohibit theft, stealing, or embezzlement because tort law addresses such obvious misconduct.

Another analogous case is *In re E.S. Bankest, L.C.*, Nos. 04-17602, 06-1220, 2010 WL 1417732 (Bankr. S.D. Fla. Apr. 6, 2010). Like Antero, the plaintiff in *Bankest* argued that the defendant aided and abetted the breach of fiduciary duties that the plaintiff's officers owed. Holding that the economic loss rule did not apply, the court noted that those officers' duties "arose not from contract but from their position as officers" of the plaintiff. *Id.* at *21. Like in *Bankest*, the prohibition against Robertson corrupting Antero's employees (and the employees' fiduciary duties) stem from tort law, not contract law. As in *Bankest*, this Court must reject Robertson's attempt to escape liability through his mischaracterization the payoff and kickback scheme and Antero's tort claims

### 2. Robertson bases his argument on inapposite authority from a lower court in Pennsylvania that the Pennsylvania state supreme court has since repudiated.

Robertson's supporting authority is simply inapt. He relies heavily on decision from a lower court in Pennsylvania, *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10 (Pa. Super. Ct. 2002), for an exceptionally broad application of the gist of the action doctrine. (Doc. 252 at 10.) *eToll* employed an "inextricably intertwined" test to bar a software developer from asserting fraud claims. *eToll*, 811 A.2d at 22. But *eToll*'s expansive "inextricably intertwined" test is wrong, as confirmed by a 2014

decision from the Pennsylvania Supreme Court, *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014).

The Third Circuit noted that the "intervening decision in *Bruno*" "cabined reliance on *eToll*'s 'inextricably intertwined' language." *Dommel Properties LLC v. Jonestown Bank & Tr. Co.*, 626 F. App'x 361, 365–66 (3d Cir. 2015). Consistent with the law in other jurisdictions, *Bruno* "reaffirm[ed]" the "duty-based" analytical framework "as the touchstone standard for ascertaining the true gist or gravamen of a claim." *Id.* Robertson never mentions *eToll*'s repudiation.

Contrary to what Robertson suggests, the proper test is not whether Antero's tort claims are "in connection" with the MSAs, (doc. 252 at 10), but whether "the facts of a particular claim establish that the duty breached is one created by parties' through the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract." *Dommel*, 626 F. App'x at 365 (internal quotations omitted).

Here, Robertson would have been prevented from corrupting Antero's employees and defrauding Antero even if no contract existed. Therefore, his defense based on the gist of the action doctrine/economic loss rule must be rejected.

**C.   Antero seeks non-contract damages for its tort claims, eliminating any doubt that its tort claims are based on duties that exist "regardless of the contract."**

The economic loss doctrine does not bar tort claims, such as Antero's fraud and fiduciary duty claims, which do not seek expectation or benefit-of-the-bargain damages, but rather seek equitable remedies like disgorgement of fees or profits. *See In re Soporex, Inc.*, 446 B.R. 750, 784 (Bankr. N.D. Tex. 2011) ("[I]f a plaintiff seeks only benefit-of-the-bargain damages, a plaintiff cannot establish an independent injury distinct from the economic losses that would be recoverable on a contract claim and the economic loss rule bars recovery of the damages sought on the negligent misrepresentation claim."); *CCE, Inc. v. PBS&J Constr. Servs.*, 461 S.W.3d 542, 552–53 (Tex. App. 2011) (holding that claim seeking to recover reliance/out-of-pocket damages is not subject to economic loss rule).

Disgorgement is a distinct remedy from contract damages. *Design Strategy, Inc. v. Davis*, 469 F.3d

284, 299-300 (2d Cir. 2006) (explaining that disgorgement is an equitable remedy, contrasted with compensatory damages). Thus, [d]isgorgement of profits is not a measure of damages available in a breach of contract action." *Henry v. Masson*, 333 S.W.3d 825, 849 (Tex. App. 2010). "[D]isgorgement of profits is an equitable remedy, appropriate for causes of action such as breach of fiduciary duty." *Id*; *see also Johnson v. Brewer & Pritchard*, 73 S.W.3d 193, 200 (Tex. 2002) (explaining how courts may disgorge a profit or benefit resulting from a fiduciary's avoidance of an opportunity belonging to a principal); see also RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 51 cmt. e (2011) ("The object of the disgorgement remedy—to eliminate the possibility of profit from conscious wrongdoing—is one of the cornerstones of the law of restitution and unjust enrichment.").

Here, Antero did not limit its damages to benefit-of-the-bargain damages under the MSAs with the defendant companies. Instead, Antero also seeks equitable remedies like disgorgement for the tort claims, including the profits and monies that Robertson and the defendant companies obtained as a product of the payoff and kickback scheme and their corruption of Antero personnel. (*See* July 2017 Rule 26(a) disclosure, Ex. 3, Appx. 028–32; April 2018 Rule 26(a) supplemental disclosure, Ex. 21, Appx. 131–37; docs. 52, ¶70; 253-1 ¶132).)

Because Antero's tort claims do not seek benefit-of-the-bargain damages, the Court must reject Robertson's attempts recast the tort claims as simply seeking remedies that are exclusively available under the applicable contracts.[14]

## IV.   Antero has pleaded a cognizable claim that Robertson is personally liable for the defendant companies' conduct.

Robertson contends that Antero has not sufficiently pleaded that it can establish his liability as an alter ego of the defendant companies or otherwise pierce the companies' veils. (Doc. 252 at 5–

---

[14] Indeed, based on Antero's review, none of the cases that Robertson cites in the economic loss section of his brief even mention "disgorgement" or otherwise involve a situation in which the plaintiff sought to disgorge ill-gotten gains from his kickback scheme. His cases are inapposite.

8.) This argument relies on a rehashing of the assertion that Antero has not pleaded a cognizable fraud claim and an erroneous and incomplete interpretation of Texas law.

Following the 2007 amendments to Tex. Bus. Orgs. Code § 21.223, there are "three broad categories in which a plaintiff may pierce the corporate veil: (1) the corporation is the alter ego of its owners and/or shareholders; (2) the corporation is used for illegal purposes; and (3) the corporation is used as a sham to perpetrate fraud." *In re Ryan*, 443 B.R. 395, 405 (Bankr. N.D. Tex. 2010) (internal quotations omitted). Any category is sufficient to pierce the corporate veil such that "alter ego is just one theory used to pierce the corporate veil." *Id.* at 406. Robertson's brief focuses on only the first category, alter ego, and avoids addressing the "fraud/sham" category, which squarely applies.

### A. Based on the kickback scheme and his suspicious dissolution of the highest-profiting defendant company, Antero has alleged that Robertson used the corporate form to perpetrate a fraud and work an injustice.

Separate from the alter ego basis for piercing the defendant companies' corporate veils, Antero may hold Robertson personally liable if he used the corporate form to "perpetrate a fraud" or "work an injustice." *Id.* at 406. The 2007 amendments to § 21.223 do not affect this analysis. *See id.*

Antero explained in detail why Robertson and his companies' kickback scheme alleges a cognizable claim for, among other things, fraud and aiding and abetting breach of fiduciary duties. Robertson's active participation in that scheme is sufficient to pierce the defendant companies' veils. Indeed, Robertson's motion never squarely addresses this basis for establishing personnel liability, and therefore he has waived or forfeited any right to challenge this category of veil piercing.

In addition to the kickback scheme, Robertson's abrupt dissolution of C&R Downhole on the day that Antero attempted service at the company's offices provides a separate basis for establishing personnel liability under the "fraud" category. Particularly instructive on this point is *Latham v. Burgher*, 320 S.W.3d 602 (Tex. App.—Dallas, 2010, no pet.), holding that a similar dissolution in the face of a potential lawsuit entitled the plaintiff to pierce the corporate veil.

In *Latham,* the owners of a family-owned and operated roofing services corporation had allegedly provided deficient services to the plaintiff. After unsuccessful attempts to resolve the parties' dispute, the plaintiff retained an attorney, who notified the corporation that it intended to make a claim for damages against it. *Id.* at 609. Shortly thereafter, the corporation's owners dissolved the corporation. *Id.* The court in *Latham* noted that a rational juror could have decided that the owners' dissolution of the company, without accounting for the plaintiff's claim, "represented dishonesty of purpose or an intent to deceive" and that the corporation's owners had used the corporation "as part of a basically unfair device to achieve an inequitable result." *Id.* at 609–10.

Just as in *Latham,* Antero alleges that Robertson dissolved "C&R Downhole LLC . . . on or around the day on which Tommy Robertson and the defendants were served with the present lawsuit." (Docs. 52 at ¶32; 253 at ¶32). Antero first attempted service at the defendant companies' business on December 8, 2015. (Ex. 18, Appx. 103.) That same day, Robertson dissolved C&R, which had assets totaling $2.17 million the day before, including $778,163 in cash. (Decl. of Joseph Slavis ¶6, Appx. 109.) The day after Antero successfully served the defendants, C&R transferred $758,230 to Robertson's holding company, TWR Holdings. (*Id.*) The transfers plainly contradict Robertson's suggestion that the company was "insolven[t]" when it was dissolved and that the insolvency was due to paying "other creditors." (Doc. 252 at 7.) Under *Latham,* Antero may pierce the corporate veils to prevent Robertson from using the dissolution to "achieve an inequitable result" and put the assets beyond Antero's reach. *Latham,* 320 S.W.3d at 610.

As further evidence that Robertson used the company defendants to "perpetrate fraud," the record shows that Robertson "reinvested" the fruits of the kickback scheme to continue defrauding Antero and corrupting its employees. First, after the Robertson defendants obtained a monopoly over West Virginia operations, Robertson used the profits he obtained to continue paying off Antero personnel. For example, from his personal bank account, Robertson transferred $409,000 to Jeff

Partridge. (Ex. 12-13, Appx. 086-089.) And Robertson, using his holding company, paid for the private jet flights that Kawcak took, which were funded through the profits his companies extracted from Antero. (Ex. 16-17, Appx. 095-101.) Second, the note that Antero uncovered from Kawcak's phone suggested that Robertson paid or credited Kawcak based on the number of wells on which the defendant companies worked. (*See* doc. 253-1 ¶43 (stating that the "Robertson defendants would pay Kawcak personally for each well that they worked on").

> **B.** **Antero has pleaded a proper claim for alter ego, both for its tort claims and its contract claims, which require a distinct analysis under Texas law.**

> **1.** **Robertson fails to analyze the tort claims under the proper framework, which is fatal to his alter ego defense.**

Robertson's defense to alter ego liability is based almost exclusively on the 2007 amendments to § 21.223. Robertson argues that "Antero relies on a preempted rule to attempt to pierce the corporate veil between Robertson and the Entity Defendants." (Doc. 252 at 5.) But the amendments (and Robertson's argument) are wholly inapplicable to Antero's <u>tort</u> claims, and Robertson was required to perform a distinct alter-ego analysis for the tort claims versus contract claims.

The 2007 amendments only applied to situations where a plaintiff attempts to pierce the corporate veil for <u>contract</u> claims. *Sparling v. Doyle*, No. 13-cv-323, 2014 WL 12489990, at *9 (W.D. Tex. Oct. 23, 2014) ("Thus § 21.223 . . . [provided] that a failure to observe corporate formalities is no longer a factor in proving alter ego in <u>contract claims</u>[.]") (emphasis added). And the statute's plain language only applies to a "contractual obligation of the corporation." *Id.* at *5 (interpreting statute and further noting that "whether a plaintiff may pierce an entity's veil pursuant to . . . the alter ego theory . . . depends on whether the plaintiff[']s claims sound in tort or contract"). Thus, "[c]ourts have generally been less reluctant to disregard the corporate entity in tort cases than in breach of contract cases." *Id.*

Here, Robertson makes no attempt to distinguish between the way in which the law treats tort

claims versus contract claims or address the merits of Antero's veil piercing and alter ego allegations. (*See* doc. 52 ¶¶32–33 (listing allegations of commingling, failure to follow formalities, Robertson's total control of the companies, sharing of staff, office space, etc.). He has therefore failed to satisfy the burden that he bears under Rule 12.

2.   **Alter ego as to the contract claims is plausibly pleaded based on extensive comingling between Robertson and the defendant companies, the companies' structure, and the substantial control Robertson exercised.**

In a contract claim, the Court may not consider allegations of constructive fraud or lack of corporate formalities after the 2007 amendments to § 21.222. *Sparling*, 2014 WL 12389990, at *11. But a court can find still find alter ego liability in a contract claim based on "commingling of funds; representations that the individual will financially back the corporation; the diversion of company profits to the individual for his personal use; inadequate capitalization; and other failures to keep corporate and personal assets separate." *Id.* at *8 ( collecting cases; internal numbering omitted).

Here, the operative complaint alleges that Robertson and the defendant companies engaged in substantial commingling of funds, which Antero has been able to confirm after the Robertson defendants produced their financial information. (Doc. 52 ¶32–33; doc. 149 at 4–5.) The commingling between Robertson and the defendant companies was done through a series of complicated transactions. As Antero's expert found, C&R would deposit money into Robertson's TWR Holdings account, establishing a loan receivable account. (Slavis Decl. ¶8, Appx. 110.) To satisfy a majority of the loan payable, the loan was converted into a Robertson personal loan on the books of TWR Holdings, which was simultaneously "satisfied" on the books of C&R by calling it a shareholder distribution. (Slavis Decl. ¶8, Appx. 110.) This shifting of debt and equity demonstrates comingling.

The record is replete with other commingling between the Robertson defendants. For example, C&R would loan cash, purchase equipment, and pay expenses for the other defendant companies. C&R would record this as "Money loaned to (entity)" indicating an intention to have the

receiving entity repay the loan. (Slavis Decl. ¶9, Appx. 110–111.) But in almost all instances of intercompany loans, the loan was not repaid, but rather transferred from an intercompany loan to a Tommy Robertson loan. (Slavis Decl. ¶9, Appx. 110–111.) On the same day as the debt transfer, the outstanding debt amount is removed, and Tommy Robertson is given equity. (Slavis Decl. ¶9, Appx. 110–111.) There is nothing in the record to suggest the "loans" were ever intended to be repaid— there are no formal loan documents, maturity dates, or interest expenses. (Slavis Decl. ¶9, Appx. 110– 111.) The evidence and allegations of commingling allege a valid alter ego claim against Robertson.

Likewise, Antero can also establish alter ego by "pleading that Defendants interchangeably share corporate resources, employees, office space, and are under common control and ownership . . . [which] is sufficient to support alter ego in a contract claim" when combined with fraud allegations. *Sparling*, 2014 WL 12489990, at *11 (citing *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990)).

 In this case, one can hardly think of a scenario where companies are more closely held: Tommy Robertson is or was the sole manager and principal of each company; the defendant companies were headquartered in a small office suite in Weatherford, Texas, shared executives and billing personnel (including many members of Robertson's immediate family), not to mention the commingling of funds and shifting of loans and equity between the companies discussed above. (Doc. 52 ¶¶32–33; doc. 149 at 4–5)[15]

Antero has plausibly pleaded its claim for alter ego liability against Robertson as to the contract claims.

## CONCLUSION

For these reasons, Antero requests that the Court deny Robertson's motion for judgment on the pleadings in full.

---

[15] For example, Calli Clarkson, Robertson's daughter, was vice president of some, if not all, the defendant companies.

Dated: April 4, 2018

Respectfully submitted,

/s/ Will Thompson
Daniel H. Charest
State Bar No. 24057803
Will Thompson
State Bar No. 24094981
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
dcharest@burnscharest.com
wthompson@burnscharest.com

ATTORNEY FOR

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served on this day, April 4, 2018, via the Court's ECF system.

/s/ Will Thompson
Will Thompson