

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
~~DALLAS~~ DIVISION
*Fort Worth*

| | | |
|---|---|---|
| ANTERO RESOURCES CORPORATION, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | *4:16 CV 668-Y* |
| v. | § | |
| | § | Civil Action No. 15-cv-3885-L |
| | § | |
| C&R DOWNHOLE DRILLING, INC., C&R | § | |
| DOWNHOLE DRILLING, LLC, BLACK | § | |
| DIAMOND HOT SHOT, LLC, STRC | § | |
| OILFIELD TECHNOLOGY, LLC, BIG TEX | § | |
| WELL SERVICES, LLC, AND TOMMY | § | |
| ROBERTSON, Individually, | § | |
| | § | |
| Defendants. | § | **JURY TRIAL DEMANDED** |

## PLAINTIFF'S [PROPOSED] THIRD AMENDED COMPLAINT

### I.   NEED FOR ACTION

Plaintiff Antero Resources Corporation ("Antero") seeks to recover damages and an accounting related to the defendants' overbilling of oilfield services. Throughout the course of the parties' relationships, the defendants deliberately and systemically billed Antero—and Antero paid—for work and services that were either never provided, or provided at an exaggerated price. Suspecting that the defendants were overbilling it, Antero exercised its undisputed contractual rights and requested an audit of the defendants' books and records. The defendants refused, despite their duty to give Antero "access at any time during normal working hours to [their] books and records." To date, the defendants have not provided Antero with a single document, and nothing suggests that they will be more forthcoming in the future. Antero seeks the protection of this Court to recover damages for the defendants' overbillings and order the defendants to comply with their undisputed duties under the contracts.

## II.   PARTIES[1]

1.     Antero Resources Corporation ("Antero") is a corporation formed under the laws of Delaware. Antero maintains its principal place of business in Denver, Colorado.

2.     Defendant C&R Downhole Drilling, Inc. ("C&R Downhole Inc.") was a corporation that, upon information and belief, was formed under the laws of Texas. C&R Downhole Inc. maintained its principal place of business in Weatherford, Texas, and is therefore a citizen of Texas.

3.     Defendant C&R Downhole Drilling LLC ("C&R Downhole LLC") is a Texas limited liability company with its principal place of business in Weatherford, Texas. None of C&R Downhole LLC's members or partners have, or are comprised of individuals or entities with, Delaware or Colorado citizenship.  On information and belief, C&R Downhole LLC's sole member is Tommy Robertson, an individual and resident of Texas.

4.     Defendant Black Diamond Hot Shot, LLC ("Black Diamond") is a Texas limited liability company with its principal place of business in Weatherford, Texas. None of Black Diamond's members or partners have, or are comprised of individuals or entities with, Delaware or Colorado citizenship. On information and belief, Black Diamond's sole member is Tommy Robertson, an individual and resident of Texas.

5.     Defendant STRC Oilfield Technology, LLC ("STRC") is a Texas limited liability company with its principal place of business in Weatherford, Texas. None of STRC's members or partners have, or are comprised of individuals or entities with, Delaware or Colorado citizenship. On information and belief, STRC's sole member is Tommy Robertson, an individual and resident of Texas.

---

[1] This complaint refers to C&R Downhole Drilling, Inc.; C&R Downhole Drilling, LLC; Black Diamond Hot Shot, LLC; STRC Oilfield Technology, LLC; Big Tex Well Services, LLC; and Tommy Robertson collectively as "the defendants."

6.      Defendant Big Tex Well Services, LLC ("Big Tex") is a Texas limited liability company with its principal place of business in Weatherford, Texas. None of Big Tex's members or partners have, or are comprised of individuals or entities with, Delaware or Colorado citizenship. On information and belief, Big Tex's sole member is Tommy Robertson, a citizen and resident of Texas.

7.      Defendant Tommy Robertson is an individual who, upon information and belief, is a citizen and resident of Texas.

### III.    JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000, exclusive of costs and interest. 28 U.S.C. § 1332(a). Plaintiff Antero Resources Corporation is a citizen of Colorado and Delaware for jurisdictional purposes. The defendants are all citizens or residents of Texas for jurisdictional purposes.

9.      Venue is proper in the Northern District of Texas under 28 U.S.C. § 1391(b)(1), because one or all of the defendants reside in the district, and all the defendants are residents of Texas. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events described herein occurred within the district.

10.     This Court may exercise personal jurisdiction over the defendants because they are residents of Texas and/or because the defendants' conduct giving rise to the claims occurred in Texas.

### IV.    FACTUAL ALLEGATIONS

**A.    Background and the Master Services Agreement**

11.     Antero is an exploration and production company engaged in the development of natural gas, natural gas liquids, and oil in the Appalachia Basin. Antero holds, and operates on, over 418,000 net acres in the Marcellus Shale and over 147,000 net acres in the Utica Shale. Antero

contracted with the Corporate Defendants to provide services for its operations in the Appalachia Basin.

12.    Antero and each of the Corporate Defendants entered into a Master Services Agreement ("MSA"), which governed the terms of their relationship.

13.    Under the MSAs, the Corporate Defendants performed "Work" for Antero. The MSAs defined "Work" as "all services, labor, equipment, supplies, tools, manufactured articles, materials, facilities, and/or goods (in whole and/or in part) to be provided by [the Corporate Defendants] to [Antero] pursuant to this [MSA] and/or any Order."[2] (MSA § 1.19.) The Corporate Defendants must perform Work to the highest industry standards; in a timely manner; using only the best tools, machinery, and equipment; and using experienced and fully trained employees. (MSA § 3.1.)

14.    Antero was only obligated to pay the Corporate Defendants for Work that was actually and satisfactorily performed. (MSA § 10.1.)  Payment was to be made at the rates and/or prices that Antero and the Corporate Defendants agreed to in work-request orders or in accordance with the Corporate Defendants' published schedule of rates and/or prices after consideration of any applicable discounts or credits.

15.    The MSAs also give Antero broad audit rights, including the right to inspect and audit the Corporate Defendants' books and records, as well as those of the Corporate Defendants' contractors and subcontractors. (MSA § 9.)  The MSAs specifically obligate the Corporate Defendants to "retain and maintain all books and records (*i.e.*, payroll records, accounting records, invoices, time

---

[2] The MSA defined "Order" as "any and all requests for Work (whether written or oral) to be performed by [C&R Downhole] under this [MSA], whether resulting from a request by [Antero] and/or a description of Work by [C&R Downhole]." (MSA § 1.15.)

reports, travel/entertainment expense reports, and all other documentation) in any way related to Work and/or this Agreement." (MSA § 9.)

16.     The MSAs also provide that "[r]epresentatives and auditors of [Antero] shall have access at any time during normal working hours to the books and records maintained by [the Corporate Defendants] relating to this [MSA] and any of the Work, and shall have the right to copy and audit such books and records." (MSA § 9.)

**B.     The Overbilling of Work and Services**

17.     Over the course of Antero's relationships with the Corporate Defendants, and while the MSAs were in effect, Antero suspected (and later confirmed) that the Corporate Defendants were systematically and deliberately overbilling Antero for Work and services that the Corporate Defendants provided—and in some cases, never provided.

18.     For example, the Corporate Defendants regularly overbilled for supervisory personnel. The Corporate Defendants stated that one supervisor, Angel Martinez, worked eight straight days at 24 hours per day. Mr. Martinez could not have possibly worked 192 straight hours. The Corporate Defendants' invoices also falsely stated that Mr. Martinez worked at multiple job sites at the same time, which was impossible given the location of the job sites. Yet, the Corporate Defendants invoiced Antero for such work. Antero's records are replete with examples of the Corporate Defendants overbilling for supervisors.

19.     The Corporate Defendants knowingly and deliberately included the exaggerated charges for supervisors and other services in their invoices in order to overbill Antero.

20.     Moreover, the invoices that the Corporate Defendants sent to Antero regularly contained unexplained charges that were not related to any Work or services that the Corporate Defendants actually provided. The Corporate Defendants regularly included mysterious charges for fuel, travel time, and "Environmental," a term that they never defined, in their invoices.   On

information and belief, the Corporate Defendants did not perform Work or services associated with these billings. Nevertheless, the Corporate Defendants knowingly and deliberately represented to Antero that they had done Work.

21.     Antero justifiably relied upon the false statements in the invoices by paying them.

22.     Moreover, Tommy Robertson, who controlled operations for the Corporate Defendants, was responsible in part for the Corporate Defendants' overbilling and fraudulent conduct. In many cases, he personally engaged in fraudulent conduct.

23.     At one point, Antero questioned Robertson about the high cost of fuel and transportation costs that the Corporate Defendants were invoicing to Antero for transporting light towers. The Corporate Defendants transported light towers using pickups (which were only capable of hauling a single light tower) rather than semi-trailer trucks (which can haul multiple light towers and thus reduce transportation costs). Robertson represented that winter road conditions forced the Corporate Defendants to use pickups. This statement was false. The road conditions did not prevent the Corporate Defendants from using semi-trucks. Antero later learned that semi-trucks hauled large drilling equipment on the same roads and in the same conditions that Robertson had stated was impossible.

24.     The real reason that Robertson declined to use semi-trucks was that pickups allowed the Corporate Defendants to reap greater profits. The pickups used more fuel and required more drivers than the semi-trucks, resulting in higher transportation costs per light tower. The Corporate Defendants invoiced those costs—after including a profit markup—to Antero.

25.     Robertson knew that the Corporate Defendants were misrepresenting the nature and scope of their work in the invoices—both for the light towers and for other overcharges—yet he never notified Antero about the false and/or fraudulent charges. The overbillings continued with his knowledge and either explicit or implicit approval.

26.     Antero relied on Robertson's false statements when it paid the invoices for the inflated fuel and transportation costs as well as the other overbillings.  But for Robertson's statements, Antero would not have paid for the Work and services, or would have paid less.

27.     Robertson further perpetuated the Corporate Defendants' scheme to overbill Antero by firing an employee who disclosed the overbilling. The employee informed Antero that the Corporate Defendants were overbilling for supervisors and other work. When Robertson learned that the employee disclosed the Corporate Defendants' overbilling and false statements, he immediately terminated the employee.

**C.     The Requested Audit and the Defendants' Refusal**

28.     Beginning in summer 2015, Antero properly requested and attempted to conduct an audit of the Corporate Defendants' performance under the MSAs. After the initial audit request, Tommy Robertson, on behalf of the Corporate Defendants, told Antero that they refused to participate in the audit.

29.     In response, Antero sent letters via FedEx to the Corporate Defendants (addressed to Tommy Robertson) again exercising its audit rights under the MSAs. These letters quoted the MSAs' audit provisions, which unequivocally provide Antero the right to access "all books and records . . . in any way related to Work and/or the [MSA]."  (MSA § 9.)  Despite this clear language, the Corporate Defendants, through Tommy Robertson, again denied Antero access to any of their books and records. The Corporate Defendants continue to refuse to provide any access to these documents. Antero seeks relief from this Court to exercise the audit rights that the MSAs unequivocally provide.

30.     Despite the Corporate Defendants refusal to participate in the audit, Antero nevertheless went to great lengths to analyze whether the Corporate Defendants' overbilled it. Despite the Corporate Defendants' failure to produce documents necessary to perform a complete audit, Antero conducted a limited audit based on information within its possession. This audit revealed that,

as a direct and proximate result of the Corporate Defendants' conduct, Antero has been overbilled and damaged in an amount substantially exceeding this Court's minimum jurisdictional requirements.

**D.    Alter Ego and Veil Piercing Allegations**

31.    Antero further alleges that some or all of the Corporate Defendants were at all relevant times the alter egos of individual defendant Tommy Robertson or, in the alternative, engaged in conduct that warrants piercing the veil of such entities. Piercing the Corporate Defendants' veils is appropriate because there is no separation of personalities between Tommy Robertson and the Corporate Defendants, resulting in a unity of interest and ownership. For example, records from the Texas Secretary of State show that Tommy Robertson is the only person named as an owner or director of each Corporate Defendant; the Corporate Defendants share the same office with Tommy Robertson in Weatherford, Texas; nor is there any evidence that the Corporate Defendants and Tommy Robertson separate bookkeeping records in any material way. Further, a review of public records shows that the Corporate Defendants failed to hold regular shareholder and/or director meetings, and if such meetings actually took place, the minutes and records of those meetings were not taken and/or maintained in an appropriate manner.

32.    Moreover, on information and belief, there is significant commingling of funds between the Corporate Defendants and Tommy Robertson such that corporate funds and assets were diverted from the Corporate Defendants to Tommy Robertson or other entities within his control. Circumstantial evidence supports Antero's allegations of such commingling. For example, C&R Downhole LLC dissolved on or around the day on which Tommy Robertson and the defendants were served with the present lawsuit. The claimed reason for the dissolution was that C&R Downhole LLC had become insolvent due to settling a personal injury lawsuit, which occurred while C&R Downhole was providing services to Antero. C&R Downhole LLC was insolvent despite Antero paying the company more than $150 million. The money that Antero paid to C&R Downhole LLC money had

to have gone somewhere. Because Tommy Robertson was the sole director or manager of C&R Downhole LLC, Robertson alone had the authority to transfer assets from C&R Downhole LLC. He either diverted C&R Downhole LLC's assets to his own bank accounts or diverted the assets to entities that he controlled, thus demonstrating a commingling of funds sufficient to find that the Corporate Defendants are Robertson's alter egos.

33.     Piercing the veils of the Corporate Defendants is also appropriate because fraud, injustice, or an inequitable result would occur if the veils are not pierced. Failure to pierce the veils of the Corporate Defendants will allow them—especially C&R Downhole LLC—to avoid liability by manipulating their assets and liabilities. In this lawsuit, Antero is seeking damages for, among other things, millions of dollars in overbillings. If Antero prevails, C&R Downhole LLC and the Corporate Defendants would be liable for millions of dollars in damages. By dissolving C&R Downhole LLC, the defendants are improperly attempting to use the corporate form to either perpetuate a fraud or at a minimum defeat Antero without addressing the claim on the merits—either of which are sufficient to pierce the corporate veil. Indeed, if Antero cannot pierce the veil, it will be blocked from obtaining the monies that C&R (through its sole manager or director Tommy Robertson) diverted from the company even if it prevailed on the merits. The defendants should not be permitted to use the corporate form to make them judgment proof. Such a result would result in an injustice and would be inequitable. It is in public interest to disregard the legal fiction of the Corporate Defendants because they are using that fiction to defeat Antero's claims without addressing the claims' merits.

34.     The Robertson defendants act(ed) as alter egos of one another. They try to present the appearance that Tommy Robertson finances all of the entities. But in reality, the "financing" is done through payables between the different corporate defendants. For example, the Robertson defendants' records, which the Robertson defendants did not turn over until Antero moved to compel, show that C&R Downhole "lends" STRC over $42 million and the rest of the defendants roughly another $20

million, including roughly $12 million to Big Tex.   These "loans" were largely "forgiven" by converting the loan into a loan from Tommy Robertson and then converting the loan from Tommy Robertson into equity. Even more, C&R pays the taxes for Tommy Robertson and his family members. This is just one example of how the defendants are alter egos of each other.

**E.    Aiding and Abetting Breach of Fiduciary Duty Allegations, Civil Conspiracy, and RICO Allegations.**

35.    The Robertson defendants, including Tommy Robertson, aided and abetted multiple Antero employees—including John Kawcak, Jeff Partridge, and Landon West—in a bribery/kickback scheme that proximately caused Antero to incur tens of millions of dollars in damages. This complaint refers to Kawcak, Partridge, and West as the "Corrupted Employees." The Corrupted Employees were responsible for supervising and monitoring Antero's expenditure of hundreds of millions of dollars for operations in West Virginia.

John Kawcak

36.    During the relevant time period, Kawcak served as Antero's Operations Superintendent in West Virginia. By his own admission from his deposition he "w[as] the seniormost person" in West Virginia and was "responsible for supervising Antero's overall operations  in – field operations in Appalachia [i.e. West Virginia] between 2009 and 2015." Antero entrusted Kawcak with ensuring that decisions regarding a) which vendor to use (including making the Robertson defendants the primary or sole provider for Antero's West Virginia operations), b) deciding how much to pay for that vendor's services, reviewing and evaluating the vendor's performance, and c) supervising Antero's overall operations with the utmost fidelity in good faith for the benefit of Antero.

37.    Kawcak's testimony under oath showed willful ignorance or callous disregard for the obligations about industry practices regarding recognized oilfield practices about bribery, kickbacks, and conflicts. Incredibly, Kawcak testified that he "ha[d] no opinion" "as to whether or not, in the

industry, it is acceptable for a company man [i.e. a representative off Antero] to receive payment in order to give a vendor work." Kawcak also testified that he did not know "whether there's an industry accepted practice that people working for a company should put the interest of the company ahead of their own personal interest for personal gain." He further testified that there was no industry custom regarding whether an employee like himself should "avoid any personal interest, influence, or relationships that might conflict or even appear to conflict with the interest of the company" and that he had no knowledge whether "there is a generally accepted view that employees of companies should report potential conflicts of interest to the company for evaluation." Even more stunning, Kawcak said that he had "no opinion" on whether "it was appropriate or inappropriate for someone working for the company to receive financial benefits for selecting a particular vendor over another vendor." A cursory review of the ethics and conflict policies of major oilfield operators show that the policies that Kawcak claimed that he had no knowledge of are well documented and undisputed.

38.     Kawcak's stunning disregard for obvious industry custom extended to the obligations that he believed that he personally owed to Antero. Kawcak said that he had "no opinion" on whether he "had a duty to disclose to Antero any relationships with vendors that might appear to be a conflict of interest." Kawcak went on to testify that he had "no opinion" on whether he was under "any duty" regarding "getting paid by vendors" or having "conflicts of interests." Based on the statements, Kawcak apparently saw no problem in taking money from vendors, including the Robertson defendants, in exchange for choosing them as vendors for Antero.

39.     Antero memorialized its Business Conduct and Ethics policy in a document dated October 7, 2013. Kawcak received this policy on November 9, 2013. The policy, which Antero noted was "essential," lays out in explicit detail conduct in which employees like Kawcak are prohibited from engaging. Prohibited conduct included, among other things, the "acceptance of gifts or favors a more than nominal value . . . from an actual or prospective . . . supplier" and the "disclosure or use of

confidential information." If conduct fell into any gray area, the employee was supposed to "ask first, act later." When asked if this policy applied to him, Kawcak testified that he had "no opinion."

40.    When again confronted with the policy, Kawcak changed his position and recognized that he owed certain duties to Antero. Kawcak testified that he a) "had an obligation to be loyal to Antero while [he] w[as] Antero employee; b) had an obligation to give Antero his "uncorrupted business judgment," c) "refrain from using [his] position at Antero for personal gain," d) had a duty to "refrain from putting [himself] in any position where [his] self- interests might conflict with [his] duties to Antero, e) understood that if there was a divergence "between Antero's interest and [his] own personal interest, it was [his] duty to tell Antero of that divergence," and f) that it was his "duty to not select an underperforming vendor in exchange for money." Moreover, Kawcak later conceded that he was "bound by a policy to not receive or give gifts to or from vendors." When Antero sent the policy to Kawcak, it asked him to raise any questions he had about the policy, but he "did not ask any questions about the policy when [he] received it. Further, Kawcak conceded that he never informed Antero's vendors, including the Robertson defendants, about Antero's policy that employees like Kawcak "must attempt to influence [vendors] to conduct their activities in conformity with all applicable laws and [the] code and must report violations of [the] code" to Antero's compliance officer.

41.    Based on Kawcak's deposition testimony, Antero policy, and industry customs, Kawcak had a special relationship with Antero. If Kawcak's interests diverge from Antero's interest, Kawcak was obligated to make the decision that was in Antero's best interest, not the decision that benefitted him personally.

42.    After Antero obtained documents through multiple motions to compel that it filed against the Robertson defendants and Kawcak, Antero was able to identify egregious examples of Kawcak's misconduct. One example is the jet that Kawcak purportedly purchased from Tommy

Robertson, which appears to be nothing more than a sham. A bill of sale for the jet that Kawcak produced for the jet omits any sales price. When deposed, Kawcak struggled to explain the terms of the jet purchase. He said that he bought it for "300[,000], 350[,000] in cash and a 2002 Mercedes-Benz." Kawcak's explanation for paying with cash became even stranger when he said that the source of the cash was not a withdrawal from a bank account, but rather "cash sitting" at his house. Kawcak could not explain how he obtained the cash or how much cash was left over after the supposed transaction. None of the withdrawals from Kawcak's bank accounts, which Antero obtained after prevailing on the motion to compel, match up cash withdrawal or other transaction. Kawcak's explanation concerning the payment for the plane further falls apart when viewed in light of other documents in the case. Kawcak testified under oath that he purchased the plane for the same price that Tommy Robertson purchased the same jet from Chance Richie, a business partner of Tommy Robertson's. But the Robertson defendants' documents show that Tommy Robertson purchased the plane for between $720,000 and $740,000. Kawcak's deposition testimony is also belied by a note that was recovered from his personal iPhone. The note, which Kawcak had previously deleted and Antero only obtained after Judge Cureton's order, strongly suggests that no money was actually exchanged for the plane, but rather it was a part of a netting transaction between Kawcak and Tommy Robertson valued at $720,000. The note shows that the Robertson defendants would pay Kawcak personally for each well that they worked on, and the cost of the plane was deducted from the money that they owed to Kawcak.

43.     Kawcak's sworn deposition testimony contained more blatant falsehoods about the plane and the unjustified financial benefits that Tommy Robertson provided Kawcak during the relevant time period of this lawsuit. Kawcak sent invoices to Tommy Robertson for costs related to Kawcak's plane, which included, for example, the costs of pilots— invoices that Tommy Robertson paid.

44.     Knowing that Antero was aware that the Robertson defendants paid the expenses for Kawcak's private plane, Kawcak tried to offer the innocent explanation that he had "some sort of plane sharing agreement" with Robertson under which Kawcak "had to pay back" the costs for Kawcak's use of Robertson's private plane and Robertson would pay Kawcak for Robertson's use of Kawcak's plane. Kawcak testified that he "should only be getting paid for Tommy's use of [Kawcak's] airplane. Kawcak's deposition testimony was very clear that Tommy Robertson was only paying for Tommy Robertson's use of Kawcak's plane, not reimbursing Kawcak for flights that Kawcak took. Specifically, Kawcak testified that Tommy Robertson "didn't" "pay [Kawcak] for expenses when [Kawcak was] flying on [Kawcak's] own airplane. In a follow-up question, Kawcak again confirmed that Robertson should not have paid Kawcak for Kawcak's use of the jet "because that's not the way the deal worked."

45.     After emphatically saying that Tommy Robertson never paid for Kawcak's personal use of the Kawcak jet, Antero confronted Kawcak with an invoice where Kawcak invoiced Tommy Robertson for tens of thousands of dollars—and Tommy Robertson paid—for aircraft expenses relating to John Kawcak's wife and her friends trip to Las Vegas as well as personal flights that Kawcak and his wife took that were totally unrelated to anything involving Antero or a flight that Tommy Robertson was on. Some of these flights took place between November 2014 and April 2015, when Kawcak was an Antero employee and when the Robertson defendants were the sole or primary provider of goods and services for the Antero operations under Kawcak's control. Despite the clear prohibition against such a relationship under Antero's code of conduct, Kawcak never disclosed to Antero the existence of this troubling relationship.

46.     When confronted with this information, Kawcak conceded that he had no explanation "why Mr. Robertson[] [was] paying 100 percent of the expenses for flights that [he] and [his] wife were on." Further, Kawcak conceded that he never paid Tommy Robertson for any time that Kawcak used

Robertson's jet. Thus, the purported "cost sharing agreement" was a smokescreen that Kawcak concocted to explain away the improper payments and benefits that he received from Tommy Robertson while the Robertson defendants had a monopoly over Antero's West Virginia operations despite their demonstrably substandard work. Unfortunately for Kawcak and Tommy Robertson, the documents plainly expose the falsehoods in Kawcak's deposition testimony and provide a powerful example of the improper benefits that the Robertson defendants provided to Kawcak.

47.     Despite the Robertson defendants' initial claims to the contrary, Antero uncovered payments to Kawcak totaling at least $729,000, which were made between October 2012 and December 2012. On October 10, 2012, a company under Tommy Robertson's control paid $150,000 to Kawcak; the same company made a $79,000 payment to Kawcak on October 17, 2012; and on December 6, 2012, the same company paid Kawcak $500,000. Kawcak tried to testify that any payment that he received from the Robertson defendants was for "oilfield equipment" that he sold to Tommy Robertson, notwithstanding the fact that there is not a single bill of sale, document, or other shred of evidence showing that the three checks were part of that transaction or another bona fide transaction.

48.     The explanation that Kawcak provided for the three checks fell apart when confronted with the documents that Antero has obtained through discovery. Kawcak testified that Tommy Robertson purchased the "oilfield equipment" for around $579,00. Kawcak was apparently trying to use the supposed purported "oilfield equipment" purchase to explain the payments from Tommy Robertson. But in creating this explanation, Kawcak forgot to account for a) the $150,000 check from October 10, 2012 and b) two prior invoices that he submitted to the Robertson defendants.

49.     Kawcak had submitted two invoices, dated October 12, 2012, to the Robertson defendants. The first invoice was for $150,000, and the second was for $78,000. The invoices stated that they were for "lease evaluation" that Kawcak performed. Kawcak testified that he "never got paid for these invoices" and that "to [his] knowledge, [they] were never paid." Kawcak, however, could

provide utterly no explanation for the $150,000 deposit that was posted in his bank account on December 11, 2012.  By testifying that the oilfield equipment purchase was for around $579,000, Kawcak thought that he was accounting for the $500,000 check and the $79,000 check. But by committing himself to that explanation, he could not explain why the Robertson defendants would pay one of the "lease evaluation" invoices (i.e. the $150,000 invoice), but not the second invoice (i.e., the $78,000 invoice). Kawcak then tried to say that the $150,000 check from Tommy Robertson made out to cash was not for Kawcak, notwithstanding a) the fact that Kawcak's bank account showed a $150,000 deposit one day after the check was cut and b) Kawcak had no explanation what the $150,000 deposit was for, despite that bank account only had $1230 in it before the deposit. Antero alleges, and the only credible explanation for the payments is, that Tommy Robertson made them in order to become Antero's primary service provider for the operations under John Kawcak's control in West Virginia. And at a minimum, these payments would create a substantial conflict of interest that Kawcak needed to disclose. Yet, Kawcak never disclosed them, stating that he did not "tell Antero about any of these payments, whether it's the hundred $50,000, the $79,000, or the $500,000" payments.

50.     The Robertson defendants made those improper payments in exchange for Kawcak choosing the Robertson defendants to provide goods and services over the goods and services of other vendors; the goods and services of other vendors were higher quality, more cost efficient, and more available when compared to the Robertson defendants. One glaring example is a comparison of the companies that performed "frac plug drillouts." When comparing the Robertson defendants' performance to other vendors performing under materially similar conditions, it took the Robertson defendants roughly twice as long to perform the job, which roughly doubled the costs to Antero because most of the goods and services are billed on a per/day basis. Kawcak never allowed a meaningful bidding process to take place in West Virginia while he and the Robertson defendants

were in West Virginia, which ensured that the Robertson defendants maintained their monopoly over Antero's operations.

51.     Relatedly, Antero had a clear company policy prohibiting its employees, including the Corrupted Employees, sharing pricing information with other vendors. Pricing information is confidential, and sharing information provides Antero with no benefit and is against Antero company policy.

52.     Yet, that is exactly what Kawcak (and the other Corrupted Employees) did with the Robertson defendants. He sent a document titled "Antero Cost Sheet" to Tommy Robertson. The cost sheet contained prices of the companies that competed with the Robertson defendants for work in West Virginia. Less than five hours after receiving the "Cost Sheet," an affiliate of Tommy Robertson used the cost sheet to revise a bid. There is no evidence that Kawcak disseminated confidential information to any vendor other than the Robertson defendants. Kawcak's provision of confidential information was a key component of the Robertson defendants' scheme. The Robertson defendants were able to adjust their prices to ensure that Kawcak had plausible deniability for hiring them despite their substandard work. Reducing the prices did not hurt the Robertson defendants because they still were able to extract huge profits by taking much longer to accomplish a job such as frac plug drillouts than other available vendors. Because the Robertson defendants charged by the day for most goods and services, the longer they took resulted in Antero paying unnecessary daily rentals.

53.     Indeed, Antero employees cannot share pricing information, and such sharing provides no benefit to Antero. Kawcak effectively conceded at his deposition that sharing this information was improper, saying "I would rather not be sending [that] stuff."

Jeff Partridge and Landon West

54.     In addition to the benefits to Kawcak, the improper benefits that the Robertson defendants provided to Antero personnel Jeff Partridge and Landon West further allowed the Robertson defendants to hack Antero's system for verifying that it paid for work that was actually provided and charged at the proper price. Like Kawcak, Partridge and West exercised substantial control over hiring vendors like the Robertson defendants and verifying and approving invoices."

55.     Partridge and West served as "completion managers" for Antero's West Virginia operations. As completion managers, they oversaw both the drillout operations across Antero's West Virginia wells, including ensuring that the Robertson defendants were the primary or sole provider for Antero's West Virginia operations. And, importantly, Partridge and West supervised and played an integral role in the billing process, which comprised verification and approval of the Robertson defendants' bills and invoices. At all relevant times, Partridge and West had a special relationship with Antero. Antero entrusted Partridge and West with the fiduciary duty of ensuring that the decisions those two made regarding which vendor to use, the vendor's prices, review of the vendor's performance, approval of tickets and invoices, and Antero's overall operations were made with the utmost fidelity in good faith and for the benefit of Antero. If Partridge's or West's interests diverge from Antero's interests, they were obligated to act in Antero's best interests, not their own interests.

56.     But instead of abiding by their fiduciary duties and protecting Antero's interests, the Corrupted Employees accepted payments, kickbacks, and benefits in excess of $1 million from the Robertson defendants.

57.     As to Partridge, Tommy Robertson made transfers totaling at least $409,000 to Partridge between March 2014 and June 2014. The timing of those transfers coincides with verbal orders and written orders that Partridge gave to the wellsite managers (Antero's representatives on a specific wellsite and who fell under Partridge's supervision) in which he ordered the wellsite managers to never question the services or items that the Robertson defendants billed, and that the wellsite

managers should just sign the tickets the Robertson defendants submitted—irrespective of whether the Robertson defendants actually provided the work, overstated the quantity, or overstated the price of the services. Partridge went so far as to threaten to terminate the wellsite managers if they questioned the Robertson defendants' invoices. For example, on April 20, 2014, Jeff Partridge emailed all Antero consultants stating, "Please sign any invoice that is brought to you that is for completions. Does not matter if you were on location when the work was done." After that directive apparently fell short, on May 16, 2014, Partridge sent a follow-up email to all Antero consultants stating: "One more time on signing tickets. Do not refuse to sign any tickets. I am still getting calls about this. I will be calling the persons named by contractors who refuse to sign any tickets." The wellsite managers who were the recipients took Mr. Partridge's statements to mean that they would be terminated or no longer work for Antero if they refused to blindly approve or otherwise not question the bills the Robertson defendants submitted.

58.     Because the initial review at the field level is the best and really only meaningful opportunity to verify that the work that a vendor bills was actually provided and was provided in a manner that met the relevant contract's performance standards, Partridge's directive that Antero field personnel should sign the tickets irrespective of whether they were fraudulent or correct fundamentally undermined Antero's verification process. To further avoid detection of their scheme to overbill Antero, the Robertson defendants and their employees, together with the Corrupted Employees, manipulated the billing records to ensure that review of the Robertson defendants' bills were directed to one of the Corrupted Employees.

59.     For example, on January 19, 2014, Jeff Partridge instructed Tommy Robertson and the Robertson defendants' employees to stop showing "SPLIT TICKET" on their invoices to hide the fact that the Robertson defendants were purposefully manipulating their invoices to fall within the

range of amounts Partridge had the authority to approve for payment.[3] Kawcak testified that "the various approvers' authority [was] a relatively commonly known fact within Antero." Evidence that Partridge knew splitting the invoices was contrary to Antero policy and improper comes from the title of the email he sent to the Robertson defendants, which said "Let's stop showing "SPLIT TICKET" on all invoices, no need to tell Denver [i.e. Antero's billing department] what we are doing." Thus, the Corrupted Employees ensured that the Robertson defendants' field tickets and invoices were approved irrespective of whether those items were actually provided or provided in a manner that violated the terms of the governing contracts.

60.     Similarly, Tommy Robertson transferred at least $100,000 to Landon West in November 2014 for work that was never performed.

61.     Like Kawcak, Tommy Robertson also provided Partridge with free flights on the Robertson defendants' personal jet. Landon West also took free flights on the Robertson defendants' jet, including flights that had nothing to do with Antero's operations. For example, the Robertson defendants flew West and his then girlfriend on a private plane from Texas to Vail, Colorado.

62.     The improper payments and benefits that the Robertson defendants provided to the Corrupted Employees caused tens of millions of dollars of damages to Antero. As a result of the bribes and kickbacks, the Corrupted Employees abdicated their duty to review the Robertson defendants work. The payments also explain why the Robertson defendants were able to maintain a monopoly over Antero's West Virginia operations in spite of demonstrably deficient work they provided. The payments also show how the Robertson defendants hacked the system that Antero had in place to verify that work was actually provided. The Robertson defendants submitted thousands of fraudulent invoices to Antero. The Robertson defendants submitted those invoices via email and other

---

[3] All of the Corrupted Employees—Kawcak, Partridge, and West— had the authority to review invoices for approval.

electronic transmission. If the Corrupted Employees had not breached the duties that they owed to Antero, Antero would not have overpaid the tens of millions of dollars that it now seeks to recover through this suit.

63.     At all relevant times, the Robertson defendants, including Tommy Robertson in his personal capacity, knew that the Corrupted Employees owed fiduciary duties to Antero. Tommy Robertson and the defendant companies interacted with the Corrupted Employees daily. The Robertson defendants knew that the Corrupted Employees were employed by Antero or were working on Antero's behalf. The Robertson defendants knew that the Corrupted Employees' job responsibilities with Antero created a special relationship with Antero, which require the Corrupted Employees to owe a duty of loyalty to Antero. Tommy Robertson was personal friends with the Corrupted Employees. The Robertson defendants would have known roughly what the Corrupted Employees income was and that the payments and benefits the Robertson defendants provided to the Corrupted Employees would materially impact the way in which they treated the Robertson defendants. The Robertson defendants and the Corrupted Employees (Kawcak, Partridge, and West) concealed their relationships, including the payments, benefits, and sharing of confidential information, from Antero. Due to this concealment, Antero could not have known that the Robertson defendants had corrupted the top-operational employee (Kawcak) in West Virginia, and two of Antero's superintendents (Partridge and West) or the detrimental effects the corruption would cause to Antero

64.     Based the numerous examples identified with specificity throughout the complaint, the Robertson defendants, including Tommy Robertson in his personal capacity, knowingly aided, abetted, and conspired with the Corrupted Employees in breaching the following duties owed to Antero:

- the duty to act only in the best interests of Antero and to exercise a high degree of care toward Antero;

- the duty to act in the utmost good faith and loyalty and with the most scrupulous honesty toward Antero;

- the duty to dedicate their uncorrupted business judgment solely for the benefit of Plaintiffs;

- the duty to avoid any self-dealing;

- the duty to place the interests of Antero before their own interests;

- the duty to refrain from using the advantage of their positions to gain any benefit for themselves or others at the expense of Antero;

- the duty to refrain from placing themselves in any position where their self-interest might conflict with their obligations to Antero as a fiduciary, including their duty to avoid engaging in business or conduct or enter into any agreement or arrangement that would give rise to actual or potential conflicts;

- the duty to avoid accepting gifts or favors of more than nominal value from an actual or prospective customer, supplier or competitor of Antero, which contravened Antero's code of business ethics;

- the duty to refrain from soliciting or accepting any payment for themselves from any person or entity transacting any business with Antero; and

- the duty to act with integrity of the strictest kind towards Plaintiffs, including not disclosing Antero's confidential information to vendors like the Robertson defendants.

65.   In conspiracy with the Robertson defendants, including Tommy Robertson in his personal capacity, and as a result of the substantial assistance that the Robertson defendants and Tommy Robertson provided, each of the Corrupted Employees breached the fiduciary duties identified above.

66.   The Corrupted Employees and the Robertson defendants actively and concealed their scheme from Antero. It was not until Antero expended considerable resources filing motions to compel that the Corrupted Employees (and the Robertson defendants) finally disclosed evidence of

the improper payments and benefits that the Robertson defendants made to the Corrupted Employees.

## V.   CONDITIONS PRECEDENT

67.   All conditions precedent to Antero's claims for relief have been fulfilled or have been performed.

## VI.   CLAIMS FOR RELIEF

**Claim One – Breach of Contract**

68.   Antero incorporates by reference the foregoing paragraphs as though fully set forth herein.

69.   Antero and the Corporate Defendants entered into MSAs. All conditions precedent to Antero's claims under each MSA have been performed or have occurred.

70.   The Corporate Defendants have breached their obligations under the MSAs. Their breaches include, but are not limited to:

    a.   Charging Antero for Work or services that they never performed;

    b.   Exaggerating the Work or services provided;

    c.   Overbilling and/or exaggerating the prices for Work or services;

    d.   Failing to maintain and/or produce books and records to Antero as required by the accounting and audit provisions of the MSAs;

    e.   Refusing to provide access to books or records as required by the accounting and audit provisions of the MSAs;

    f.   Failing to provide accurate information and/or failing to disclose information that the Corporate Defendants had a duty to disclose to Antero.

71.   On the basis of these breaches, Antero has been damaged in an amount exceeding this Court's minimum jurisdictional requirements.

**Claim Two – Declaratory Judgment:**

72.     Antero incorporates by reference the foregoing paragraphs as though fully set forth herein.

73.     This dispute involves a justiciable controversy involving the rights and status of the parties. The controversy is real and substantial and involves a genuine conflict and is not merely a theoretical dispute.

74.     Antero seeks a declaration that 1) the Corporate Defendants have failed to comply with their contractual obligations to maintain and/or provide Antero with their books and records, 2) Antero is entitled to all books and records (as those terms are defined in the MSAs) in connection with its requested audits under the MSAs, 3) the Corporate Defendants overbilled Antero for work and services in violation of the MSAs, and 4) the Corporate Defendants must comply with their contractual obligations under the MSAs.

**Claim Three – Unjust Enrichment**

75.     Antero incorporates by reference the foregoing paragraphs as though fully set forth herein.

76.     As a result of their wrongful and fraudulent conduct, the Corporate Defendants billed and were paid for Work and services that they did not provide. The defendants obtained monies that rightfully belong to Antero. It would be inequitable and unjust for the defendants to retain these wrongfully obtained monies.

77.     Antero is entitled to restitution and seeks an order establishing the defendants as constructive trustees of the monies unjustly obtained, plus interest.

**Claim Four – Fraud**

78.     Antero incorporates by reference the foregoing paragraphs as though fully set forth herein.

79.     Throughout the course of the parties' relationship, the Corporate Defendants have provided invoices, bills, and statements to Antero. These documents purport to reflect accurately the Work and services that the Corporate Defendants provided to Antero. However, the Corporate Defendants' invoices, bills, and statements and other documents and representations contain false and misleading information, including overbilling for supervisory work. The Corporate Defendants and Tommy Robertson made these and other representations knowing that they were false, intending for Antero to rely on them.

80.     Moreover, the Corporate Defendants and Tommy Robertson have knowingly withheld documentation in their possession that would show that Antero was overbilled for work and services. By withholding such documentation, the Corporate Defendants and Tommy Robertson perpetuated the fraud. This constitutes a fraudulent and material omission.

81.     The Corporate Defendants and Tommy Robertson further perpetuated their fraud by terminating the employee who informed Antero about some of the overbillings.

82.     Antero relied on the defendants' fraudulent statements and omissions. But for the fraudulent conduct, Antero would not have paid for the overbilled work and services, or would have paid less. As a result of its reliance on the defendants' fraudulent conduct, Antero has suffered damages.

**Count Five – Negligent Misrepresentation and Negligence**

83.     Antero incorporates by reference the foregoing paragraphs as though fully set forth herein.

84.     The defendants owe Antero an independent tort duty to bill their work and services accurately, truthfully, and refraining from supplying false or misleading information. The defendants also owe Antero a duty to maintain or produce documents or otherwise account for their overbilling of Work and services. The defendants failed to exercise reasonable care in performing these duties.

Instead, the defendants acted with knowledge of the high degree of risk that their actions would result in injury to Antero, conscious indifference to Antero's rights, and actual malice.

85.     The defendants' representations that the invoices to Antero were accurate were false. The defendants either failed to investigate the original representations or agreed to conceal their knowledge regarding their accuracy. The defendants therefore did not exercise reasonable care or competence in obtaining or communicating the information to Antero.

86.     These allegations assert that the defendants violated an independent tort duty of ordinary care that arises outside of the contracts. Their actions amount to more than a mere failure to comply with the MSAs.

87.     As a result of the defendants' negligent representations and/or negligence, Antero has been damaged in excess of this Court's minimum jurisdictional limits.

**Count Six – Accounting**

88.     Antero incorporates by reference the foregoing paragraphs as though fully set forth herein.

89.     At all relevant times, Antero had a contractual relationship with the Corporate Defendants.

90.     As a result of the Corporate Defendants' overbilling and other conduct described herein, Antero paid monies to the Corporate Defendants that rightfully belong to Antero.

91.     The amount of money that the Corporate Defendants owe Antero cannot be ascertained without an accounting of the receipts from the aforementioned transactions.

92.     This claim for an accounting is a suit in equity. An accounting is properly alleged as a cause of action and is necessary here because the facts and accounts at issue are so complex that adequate relief cannot be obtained at law. Standard discovery procedures will not provide adequate relief because of the case's complexity. The Corporate Defendants billed Antero for hundreds of

millions of dollars of work and services and there are thousands of transactions to parse. And, on information and belief, many of the documents relevant to the case are outside this Court's subpoena power or are impracticable to obtain through standard discovery procedures.

93.     In the alternative, Antero seeks an accounting as a remedy in conjunction with its other causes of action.

## Count Seven – Conversion

94.     Antero incorporates by reference the foregoing paragraphs as though fully set forth herein.

95.     By overbilling Antero, the Corporate Defendants substantially interfered with monies that Antero lawfully had the right to possess. They interfered with such possession by falsely and fraudulently representing that they had performed Work and services for Antero that they had never performed. But for the defendants' false representations, Antero would not have paid for the overbilled Work and services. Antero has demanded that the defendants return possession and control of the monies; the defendants have refused. As a result, Antero has suffered damages in excess of this Court's minimum jurisdictional limits

## Count Eight – Attorney's Fees

96.     Antero incorporates by reference the foregoing paragraphs as though fully set forth herein.

97.     As a result of the defendants' actions and the need to protect its interests, Antero has retained lawyers to represent it in this action. Antero has agreed to pay them a reasonable fee for their services.

98.     Pursuant to § 13.11 of the MSAs, the defendants are responsible for Antero's attorney's fees. The MSA requires the Corporate Defendants to indemnify Antero for any "expense

of any kind or character" that "arises out of or result[s] from [the Corporate Defendants'] failure to comply with" the MSAs.

99.    Antero is also entitled to attorney's fees because the defendants have acted in bad faith, wantonly, or for oppressive reasons.

**Count Nine - Aiding and Abetting Breach of Fiduciary Duty under West Virginia law**

100.    Antero incorporates by reference the foregoing paragraphs as though fully set forth herein.

101.    As discussed in detail in this Complaint, the Corrupted Employees owed fiduciary duties to Antero.

102.    As fiduciaries, the Corrupted Employees were required to act in good faith, with undivided and unqualified loyalty, and in the best interest of Antero. The Corrupted Employees were further required to make truthful and complete disclosures to Antero, including disclosing their relationships with the Robertson defendants. The Corrupted Employees were forbidden from obtaining any improper advantage to the detriment of Antero.

103.    By participating in the fraudulent bribe/kickback scheme with the Robertson defendants discussed herein, the Corrupted Employees breached the fiduciary duties that they owed to Antero. Contrary to their fiduciary duties and obligations, the Corrupted Employees fraudulently, dishonestly, and illegally accepted bribes and/or benefits for their own personal benefit and to Antero's detriment.

104.    The Robertson defendants, including Tommy Robertson knowingly participated in the Corrupted Employees' breach of their fiduciary duties. The Robertson defendants, including Tommy Robertson, had knowledge of the Corrupted Employees' fiduciary duties to Antero and also knew that the Corrupted Employees were breaching their fiduciary duties to Antero by engaging in a kickback scheme discussed herein. Accordingly, the Robertson defendants, including Tommy

Robertson, provided substantial assistance to the Corrupted Employees in breaching their fiduciary duties through the kickback scheme.

105.    As a direct and proximate result of the assistance that the Robertson defendants, including Tommy Robertson, provided to the Corrupted Employees in breaching their fiduciary duties, Antero suffered damages as discussed throughout this Complaint, including using vendors other than the Robertson defendants who were far more qualified, proficient and cost-efficient vendors were available.

**Count Ten - Aiding and Abetting Breach of Fiduciary Duty under Colorado Law**

106.    Antero incorporates by reference the foregoing paragraphs as though fully set forth herein.

107.    As discussed in detail in this Complaint, the Corrupted Employees owed fiduciary duties to Antero.

108.    As fiduciaries, the Corrupted Employees were required to act in good faith, with undivided and unqualified loyalty, and in the best interest of Antero. The Corrupted Employees were further required to make truthful and complete disclosures to Antero, including disclosing their relationships with the Robertson defendants. The Corrupted Employees were forbidden from obtaining any improper advantage to the detriment of Antero.

109.    By participating in the fraudulent bribe/kickback scheme with the Robertson defendants discussed herein, the Corrupted Employees breached the fiduciary duties that they owed to Antero. Contrary to their fiduciary duties and obligations, the Corrupted Employees fraudulently, dishonestly, and illegally accepted bribes and/or benefits for their own personal benefit and to Antero's detriment.

110.    The Robertson defendants, including Tommy Robertson knowingly participated in the Corrupted Employees' breach of their fiduciary duties. The Robertson defendants, including Tommy

Robertson, had knowledge of the Corrupted Employees' fiduciary duties to Antero and also knew that the Corrupted Employees were breaching their fiduciary duties to Antero by engaging in a kickback scheme discussed herein. Accordingly, the Robertson defendants, including Tommy Robertson, provided substantial assistance to the Corrupted Employees in breaching their fiduciary duties through the kickback scheme.

111.    As a direct and proximate result of the assistance that the Robertson defendants, including Tommy Robertson, provided to the Corrupted Employees in breaching their fiduciary duties, Antero suffered damages as discussed throughout this Complaint, including using vendors other than the Robertson defendants who were far more qualified, proficient and cost-efficient vendors were available.

**Count Eleven - Aiding and Abetting Breach of Fiduciary Duty under Colorado Law**

112.    Antero incorporates by reference the foregoing paragraphs as though fully set forth herein.

113.    As discussed in detail in this Complaint, the Corrupted Employees owed fiduciary duties to Antero.

114.    As fiduciaries, the Corrupted Employees were required to act in good faith, with undivided and unqualified loyalty, and in the best interest of Antero. The Corrupted Employees were further required to make truthful and complete disclosures to Antero, including disclosing their relationships with the Robertson defendants. The Corrupted Employees were forbidden from obtaining any improper advantage to the detriment of Antero.

115.    By participating in the fraudulent bribe/kickback scheme with the Robertson defendants discussed herein, the Corrupted Employees breached the fiduciary duties that they owed to Antero. Contrary to their fiduciary duties and obligations, the Corrupted Employees fraudulently,

dishonestly, and illegally accepted bribes and/or benefits for their own personal benefit and to Antero's detriment.

116.    The Robertson defendants, including Tommy Robertson knowingly participated in the Corrupted Employees' breach of their fiduciary duties. The Robertson defendants, including Tommy Robertson, had knowledge of the Corrupted Employees' fiduciary duties to Antero and also knew that the Corrupted Employees were breaching their fiduciary duties to Antero by engaging in a kickback scheme discussed herein. Accordingly, the Robertson defendants, including Tommy Robertson, provided substantial assistance to the Corrupted Employees in breaching their fiduciary duties through the kickback scheme.

117.    As a direct and proximate result of the assistance that the Robertson defendants, including Tommy Robertson, provided to the Corrupted Employees in breaching their fiduciary duties, Antero suffered damages as discussed throughout this Complaint, including using vendors other than the Robertson defendants who were far more qualified, proficient and cost-efficient vendors were available.

**Count Twelve - Civil Conspiracy**

118.    Antero incorporates by reference the foregoing paragraphs as though fully set forth herein.

119.    The Robertson defendants, including Tommy Robertson individually, and the Corrupted Employee (sometimes referred to collectively as the "Conspirators") combined and conspired with each other to accomplish an object; they had a meeting of the minds on the object to be accomplished or the course of action to be followed; they performed one or more unlawful, overt acts in furtherance of their objectives; and Antero suffered damages as a result of that conspiracy. The Conspirators acted in concert to breach fiduciary duties, to defraud Antero, and to convert Antero's property, which they accomplished, in part, through the use of the mails and wires.

120.     The Conspirators had a meeting of the minds on their course of action or object, which was to fraudulently bill Antero excessive amounts for goods and services for Antero's West Virginia operations; to have the Corrupted Employees approve the inflated and fraudulent quotes and invoices (or ensure that Antero's wellsite managers rubber stamped the Robertson defendants' field tickets); to have the Robertson defendants continue providing services that fell below the applicable performance standards in the contract and below the performance of other available vendors providing similar services; to kick back some portion of the overpayments as bribes to the Corrupted Employees; to pay these bribes and kickbacks through the Robertson defendants, Tommy Robertson individually, or entities under the Robertson defendants' control. This scheme could not have been accomplished but for a meeting of the minds amongst the Conspirators. The Conspirators fraudulently concealed their scheme from Antero. Indeed, Antero was only able to uncover the breadth of the conspiracy after obtaining court orders mandating that the Robertson defendants produce financial information evidencing the financial benefits they provided to Antero personnel.

121.     The Conspirators' actions in furtherance and concealment of their scheme were committed knowingly, willfully, and/or maliciously and resulted in damages to Antero for which recovery is sought. Antero suffered tens of millions of dollars in damages as direct and proximate result of the Conspirators' conduct. The Robertson defendants' intentional and egregious conduct justifies an award of punitive damages to Antero.

**Count Thirteen - Violations of RICO (18 U.S.C § 1962(c))**

122.     Antero incorporates by reference the foregoing paragraphs as though fully set forth herein. From at least 2012 to the present, the Robertson defendants and their co-conspirators (named co-conspirators like the Corrupted Employees and unnamed co-conspirators unnamed) have constituted an association-in-fact Enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise").

123.    The Enterprise was engaged in, and the Enterprise's activities affected, interstate and foreign commerce, and the Enterprise used the instrumentalities of interstate commerce to further the Enterprise's racketeering activity. The Enterprise was involved in transactions exceeding $100 million. The work was purportedly provided in West Virginia. The invoices for the purported work were transmitted through the mails and wires to Colorado. The Robertson defendants and their co-conspirators, named and unnamed, agreed to and in fact did conduct and participate in the conduct of the Enterprise through a pattern of racketeering activity for the unlawful purpose of intentionally profiting from the predicate acts of mail fraud and wire fraud through which they were able to extract millions of dollars from Antero.

124.    The Robertson defendants conducted and participated, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity consisting of the following predicate acts of racketeering within the meaning of 18 U.S.C § 1961(b).

- The Robertson defendants engaged and conspired to engage in mail fraud in violation of 18 U.S.C. § 1341. As explained in detail earlier, and incorporated herein, the Robertson defendants' acts of transmitting the work orders, bills, and invoices, which sought payment for work that was deficient and/or not even provided, represents an intentional "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." The Robertson defendants and co-conspirators used the mails to execute that scheme.

- The Robertson defendants engaged and conspired to engage in wire fraud in violation of 18 U.S.C. § 1343. As explained in detail earlier, and incorporated herein, the Robertson defendants' acts of transmitting the work orders, bills, and invoices, which sought payment for work that was deficient and/or not even provided, represents an intentional "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." The Robertson defendants and co-conspirators used wires, including transmissions through email of the fraudulent invoices, to execute that scheme.

125.    The intentional acts— which number in the tens of thousands and occurred over multiple years—of mail fraud, in violation of 18 U.S.C § 1341, and wire fraud, in violation of 18 U.S.C § 1343 constituted a pattern of racketeering activity pursuant to 18 U.S.C § 1961(5).

126.    As a direct and proximate result of the Robertson defendants and their co-conspirators racketeering activities and violations of 18 U.S.C. § 1962(c), Antero has been injured in its business and property, which includes the tens of millions of dollars in overbillings and unnecessary payments that Antero made to the Robertson defendants due to the racketeering activity. The Enterprise directly and proximately caused Antero's damages when read in conjunction with the relevant factual allegations described above.

**Count Fourteen - Violations of RICO (18 U.S.C § 1962(d))**

127.    Antero incorporates by reference the foregoing paragraphs as though fully set forth herein. As set forth above, from at least 2012 to the present, the Robertson defendants and their co-conspirators (both the Corrupted Employees and unnamed co-conspirators) conspired to violate 18 U.S.C.§ 1962(c), including the scheme through the Robertson defendants used the mails and wires to overbill Antero millions of dollars for work that was either not provided or provided in a manner that was deficient as well. The scheme's conduct further included a conspiracy to make the Robertson defendants the sole provider of services for despite the fact that far more qualified, proficient and cost-efficient vendors were available.

128.    As a direct and proximate cause of the Robertson defendants conduct, Antero has been injured in its business and/or property, as set forth above in greater detail.

### VII.    Discovery Rule

129.    Antero asserts that any applicable statutes of limitations should be tolled with respect to Antero's claims because the defendants deliberately withheld information from Antero that was in their exclusive possession, custody, or control, which would have allowed Antero to discover the their breaches, fraud, and negligence. Under the MSAs and at common law, the defendants had an obligation to provide Antero with information to conduct the audit. The defendants refused, which enabled them to perpetuate the fraud and breaches of the MSAs and other misconduct.

## VIII.   Punitive Damages

130.    Antero seeks exemplary and punitive damages on the basis that the defendants acted with actual malice and fraudulently toward Antero.

## IX.     Jury Demand

131.    Antero demands a jury trial.

## X.      Prayer for Relief

132.    Antero respectfully prays:

a.  That the defendants be cited to appear and answer herein;

b.  That the Court enter judgment and award:

    i.    Actual damages

    ii.   Pre-judgment and post judgment interest at the maximum legal rate;

    iii.  Costs of court

    iv.   Declaratory judgment as requested above;

    v.    An accounting;

    vi.   An award of punitive damages;

    vii.  Attorney's fees;

    viii. All such other relief, both general and special, at law or in equity, to which Antero may show itself justly entitled.

Dated: March 14, 2018

Respectfully submitted,

Daniel H. Charest
State Bar No. 24057803
Will Thompson
State Bar No. 24094981
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
dcharest@burnscharest.com
wthompson@burnscharest.com

Attorneys for the plaintiff

## CERTIFICATE OF SERVICE

   This is to certify that a true and correct copy of the foregoing instrument has been served on this day, March 14, 2018, via the Court's ECF system as indicated below:

Kevin G. Corcoran
Robert Booth
MILLS SHIRLEY L.L.P.
400 Washington Building
2228 Mechanic Street, Suite 400
Galveston, Texas 77550
Telephone: (409) 763-2341
Facsimile: (409) 763-2879
kcorcoran@millsshirley.com
rbooth@millsshirley.com

J. Frank Kinsel, Jr.
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
Telephone: (817) 877-2816
Facsimile: (817) 877-2807
jkinsel@canteyhanger.com

Jacob B. Kring
Laura M. Fontaine
HENDRICK KRING, PLLC
1700 Pacific Avenue, Suite 4650
Dallas, Texas 75201
Telephone: (214) 880-9600
Facsimile: (214) 481-1844
jacob@hedrickkring.com
laura@hedrickkring.com

            _____
            Daniel H. Charest